## COSDEN PIPE LINE CO. v. BERRY.

No. 12215—Opinion Filed July 25, 1922.

Rehearing Denied Oct. 17, 1922.

(Syllabus.)

**1. Master and Servant—"Vice Principals."**

Where an employe is in charge of the master's business or any department thereof, whose duties are exclusively supervision, direction, and control of the work over a subordinate employe engaged therein, whose duty it is to obey him, he is a vice-principal, notwithstanding he may be subject to general orders or superintending control of a general manager.

**2. Same—Liability for Injury by Fellow Servant.**

The master is not an insurer of the safety of his servant; neither is the master required to superintend and direct the manner of the execution of minor details, and where such has been negligently done by a servant to the injury of a fellow servant, the master would not be liable.

**3. Negligence—Contributory Negligence and Assumption of Risk—Jury Questions—Issues and Proof—Instructions.**

Under a constitutional provision requiring it. contributory negligence is a question which the court must never decide, but it must be submitted to the jury for their determination, but contributory negligence on the part of the plaintiff presupposes negligence on the part of the defendant. Before the question of contributory negligence on the part of the plaintiff can arise, negligence of the defendant must first be shown. If there is no negligence upon the part of the defendant shown, and the negligence of the plaintiff only, or of his fellow servant, caused the injury, then it is primary, not contributory, negligence on his part, and there can be no case to go to the jury. Contributory negligence is a matter of defense and must be pleaded. The question of assumption of risk is also a matter of defense and must be pleaded, and is also, under our Constitution, a matter for the jury to decide; but in both instances it is the duty of the trial court to properly instruct the jury upon the law of both defenses.

**4. Pleading—Sufficiency of Petition—Method of Objection.**

Where the sufficiency of a petition is challenged solely by an objection to the introduction of evidence thereunder. such objection, not being favored by the courts, should generally be overruled, unless there is a total failure to allege some matters essential to the relief sought, and should sel-

dom, if ever, be sustained when the allegations are simply incomplete, indefinite, or conclusions of law.

**5. Master and Servant—Liability for Injuries to Servant—Failure to Safeguard Work.**

The obligation of the master to the servant to provide a reasonably safe method for the performance of his work is one of the master's nondelegable duties, the neglect of which imposes a liability for resulting injury, irrespective of any fellow servant.

**6. Same.**

Where an employe is killed while assisting in dismantling a water tank built of two-by-sixes, 16 feet long, held in place by iron hoops riveted together, and the tank is caused to collapse by the removal of the iron hoops, and if such death is due to the negligent act of one in charge of the work in failing to provide some safe method of performing the work, the master cannot avoid liability upon the ground that the negligence was that of a fellow servant, since it is held that it is a primary duty, and nondelegable, of the master to provide a safe method of work, and if negligence existed in this respect, it was negligence in the general method of the work, and not a mere detail of its performance, and arising during the progress of the work.

**7. Same.**

Even though a servant assumes the known and obviously increased hazards of a work which, by reason of the character of the work, becomes more dangerous as the work progresses, yet a master in such case is not absolved from any duty to furnish a safe place to work, but must use ordinary care to make the place where his servant works as safe as it can be made under the conditions of the work to be performed.

**8. Appeal and Error—Prejudicial Error—Abstract Instructions.**

As the very purpose of instructions is to aid the jury in arriving at a proper verdict in the case, the jury should be informed in clear, plain, and concise terms as to the law which is applicable to the particular case under consideration, and it is improper and erroneous for a court to give instructions to the jury which are not applicable to the case in any of its phases but which are mere abstract statements of the law. This rule holds good although the instructions contain correct statements in this respect, for the jury is not concerned with what the law may be generally, but only with that very small portion of its which must govern the particular matters under consideration. It is, then, the plain duty of a trial court to refrain from giving abstract instructions of its own motion, or at the request of either party. The principal and very forcible objection to abstract instructions, however correct in themselves, is that they may

be misleading, in that they tend to draw the minds of the jurors away from the real facts in the case to something which they assume to exist, but which cannot be found in the record. Whether an abstract instruction will call for a reversal of a case depends on the determination of the question whether as a result of the instruction prejudice resulted to the complaining party. It is generally agreed that legal abstractions in a charge are not always hurtful and, unless it appear that they may have been so, the giving of the same while never to be approved, is not reversible error. But if an instruction, although unobjectionable as an abstract proposition of law, is calculated to mislead the jury and affect their conclusion upon the issue submitted to them, it will call for reversal. Still while abstract instructions are not generally ground for reversal, it is the better practice to omit or refuse instructions of that character. (14 R. C. L. par. 49, pp. 782-784.)

**9. Same—Harmless Error—Instructions.**

It is only when an erroneous instruction has resulted in prejudicing the rights of the complaining party that the judgment will be reversed, and it is the general rule that such action will not be taken by the appellate court for error in giving or refusing to give instructions if the verdict is manifestly right, or if it appears from the evidence that no other verdict should have been properly returned by the jury under instructions entirely correct. Another rule well settled by the authorities is that erroneous instructions will not be ground for reversal where it clearly appears that the jury were not influenced thereby. (14 R. C. L. par. 74, pp. 815-817; Horton v. Early, 39 Okla. 99, 134 Pac. 436.)

**10. Same—Instruction on Contributory Negligence.**

An instruction which states that the burden of proof is upon the defendant to establish a definition of contributory negligence is not open to the objection that the jury might have been misled when none of the evidence of plaintiff tends to prove contributory negligence.

**11. Evidence—Res Gestae—Negligence—Other Acts of Negligence.**

While all the circumstances of the transaction under investigation which constitute the res gestae of the occurrence are admissible in evidence, and in this way evidence of acts of negligence not alleged may be received for consideration by the jury, still this is solely for the purpose of determining whether the specific acts of negligence alleged in the petition have been established. No matter how much evidence there may be of acts of negligence admitted under the operation of this rule, there can be no lawful recovery unless one or more of the specific acts of negligence set forth in the petition have been established to the satisfaction of the jury. The other acts of negli-

gence admitted as a part of the res gestae of the transaction may be looked to, to throw light on the question as to whether the specific acts of negligence relied on have been established, but, no matter how well established such other acts may be, the jury are not authorized to find in favor of the plaintiff unless at least one of the specific acts alleged has been proved to their satisfaction.

## 12. Trial—Refusal to Give Abstract Instruction.

It is not error for a court to refuse to give a requested instruction although it may correctly state an abstract proposition of law, where there are no facts adduced that could constitute a basis for said instruction.

## 13. Appeal and Error—Questions of Fact—Verdict Conclusive—Sufficiency of Petition—Damages for Death of Servant.

The evidence in this case has presented questions of fact to the jury upon the following propositions: First. Was Earl Gay a vice principal within the terms defined in the instructions? Second. Was the method used by the defendant company in dismantling the tank a reasonably safe method? Third. Was the place to which the deceased was assigned to work a reasonably safe place in which to work? The jury having found adversely to the defendant company, it is held that the said verdict is reasonably sustained by competent evidence. It is held, furthermore, that the allegations in the petition in this case, in the absence of a motion to make more definite and certain and of a demurrer raising its sufficiency, are sufficient to raise an issue on the three propositions stated above.

Error from District Court, Kay County; J. W. Bird, Judge.

Action by May M. Berry, as the surviving widow of A. B. Berry, deceased, against Cosden Pipe Line Co., a corporation, for damages for negligent death. From judgment for plaintiff, defendant appeals. Affirmed.

J. C. Denton, Chas. E. Bush, L. G. Owen, and A. F. Moss, for plaintiff in error.

E. E. Glasco, Roy Glasco, and G. A. Chappell, for defendant in error.

ELTING, J. This suit was commenced by the plaintiff below, May M. Berry, against the Cosden Pipe Line Company, a corporation, defendant below, on the 9th day of January, 1920, by filing a petition in the district court of Kay county, Okla.

The plaintiff below sued as the surviving widow of A. B. Berry, deceased, for the use and benefit of herself and the use and benefit of her minor child, Hildred Berry.

By reason of the fact that the pleadings and issues joined therein are up in this appeal for review and are necessarily involved in the consideration of the errors assigned, we will set forth the following portions of the petition of the plaintiff below:

"That as the servant and employe of said company the said A. B. Berry worked under the direction of one Earl Gay, the agent, foreman, servant, and employe of the defendant company, and was subject to his orders; that at the time of the injury which caused the death of the said A. B. Berry, the said Earl Gay, as the foreman, agent, servant, and employe of the defendant company was engaged in tearing down and removing the oil tanks and water tank and other property constituting what is known as the Blackwell Pump Station, the property of the said defendant company; that the said Earl Gay in tearing down and removing said tanks and property was performing his duty as the agent, employe, and servant of said company under their commands and directions; that on the 13th day of December, 1919, the said Earl Gay working in the capacity hereinbefore stated, and in charge of a number of workmen, among whom was the deceased, A. B. Berry, were engaged in tearing down and removing the water tank which was a part of the buildings constituting the Blackwell Pump Station situated about six miles west of the town of Peckham, Kay county, Okla.; that the said water tank was the property of the defendant company, having been constructed by said company about two years prior to the date above stated; that the said water tank was constructed of timbers consisting of 2x6's 16 feet long, set on end and held in place by steel hoops, which constituted the walls of said tank, the top and bottom of same being constructed of other heavy timbers; that said water tank was improperly constructed by said company, in that no braces were used in constructing the top of said tank, the purpose of which braces is to hold the 2x6's together and prevent their falling outward; that said water tank when completed had a capacity of about 1,600 barrels of water; that on the date above mentioned, the said A. B. Berry, deceased, was working under the orders and directions of the said foreman and it was the duty of the said A. B. Berry to remove the steel hoops from around said tank by cutting the rivets with a hammer and chisel; that the said A. B. Berry was wholly inexperienced in the work he was then engaged in and relied strictly upon the order and direction of Earl Gay, his foreman, in performing said work, who was experienced in such work, and relying upon the experience, judgment, care, and caution of said foreman for his safety and protection, the said A. B. Berry, with other workmen, had removed all the hoops from said tank, except the bottom hoop thereof; that said tank at the time contained about two feet of water and a great quantity of ice which, when all hoops were removed, except the

one near the bottom of same, left said tank in an extremely dangerous condition because of the great amount of pressure of the ice and water, and for the further reason that the timbers constituting the walls were not braced in a proper manner to resist said pressure and because thereof it was the duty of said foreman as the agent and employe of the defendant company to exercise the greatest care and caution to prevent injury to the deceased and the other men who worked under him; but instead, the said foreman, as the agent and employe of said company, negligently and carelessly and in total disregard of the safety of the men who worked under him, permitted said bottom hoop to be removed, and under his orders and direction, and in performance of his duty as the employe of said company the said A. B. Berry was proceeding to remove said hoop when said tank suddenly collapsed, the timbers thereof falling outward because of the great pressure of the ice and water therein and crashing to the earth like a death-trap, falling upon the said A. B. Berry, deceased, before he could escape therefrom, though making every effort possible to escape said danger, was caught beneath said heavy timbers, one of which striking him upon the side of the head and fracturing his skull, from which injury the said A. B. Berry died in a few hours thereafter.* * *

"That the deceased, A. B. Berry, at the time of receiving his injury, was the servant and employe of the defendant company, and was acting in the due course of his employment when he lost his life by the gross negligence and lack of due caution upon the part of Earl Gay, the servant, agent, and employe of the defendant company, who was directing his labors at the time said injury was received; that the gross negligence and want of care and caution on the part of the defendant company and their agent and employe, Earl Gay, was the direct and proximate cause of the death of the said A. B. Berry, that the deceased at all times was careful and cautious and obeyed and followed the directions of said foreman in the performance of his duties as such employe, and was so obeying said orders and directions of said foreman at the time he received the injuries which caused his death, and was not in any way guilty of contributory negligence."

It appears further from said petition that A. B. Berry, husband and father, died from injuries received on the 14th day of December, 1919. There was also some allegations in the petition in regard to the carelessness of Earl Gay, the foreman, and alleged agent of the corporation, neglecting to furnish medical attention to the deceased, Berry, and it was alleged that the death of Berry was due to the injuries received and that the neglect of Gay in not furnishing immediate and proper medical attention contrib-

uted to the suffering of the deceased and hastened his death.

There was no demurrer filed by the defendant to the petition of the plaintiff.

There appears from the record that the defendant company did, however, when the plaintiff below made proffer of evidence, object to the introduction of any testimony, for the reason that the petition did not state facts sufficient to constitute a cause of action.

Answer to petition was filed thereto by the defendant company which was in words and figures as follows, omitting the caption:

"Comes now the defendant, Cosden Pipe Line Company, a corporation, and for answer to the petition filed by the plaintiff herein, says:

"1. It denies each and every allegation in said petition contained, except such as are hereinafter expressly admitted.

"2. For further answer to the plaintiff's petition herein, the defendant says:

"A. That the plaintiff has no legal capacity to sue the defendant, and that the want of such legal capacity is not apparent on the face of the petition.

"B. The defendant further says that if plaintiff's intestate was injured and killed at the time named in said petition, that he was injured and killed not by reason of any want of care on the part of defendant, or by reason of any failure on the part of the defendant, to perform any of its duties as employer, but that said intestate was injured and killed by reason of his own want of ordinary care, which want of ordinary care contributed to cause of his injury, but for such want of ordinary case the plaintiff's intestate would not have been injured or killed, in this: That the said intestate immediately before and at the time of his injury knew of the manner in which said tank was constructed, knew that the same contained and had no braces, as described in plaintiff's petition, knew that the same contained ice and water, and that there was pressure from within which would likely force the staves outward, over the protest and advice of the foreman and his fellow workmen, and after the rivets had been cut attempted to separate the hoop or iron band around the bottom of the tank, by inserting his chisel at the joint and striking the same with a hammer, and in this way, that he pulled said hoop or iron band loose from said tank and removed the support, and contrary to the advice and instruction of his foreman and fellow workmen, and that this want of ordinary care on his part contributed to cause his injury and death, and but for this want of ordinary care on his

part he would not have been injured or killed.

"3. The defendant, for further answer to the plaintiff's petition herein, realleges all of the allegations of the foregoing defenses, and in addition thereto says that plaintiff's intestate was aware of the condition of said tank as to inside supports, braces, or staves, knew that the dead wood had been removed therefrom, and knew the danger likely to result from loosening the last remaining hoop or band around said tank, without first making some preparation for draining the same. That he was experienced in this character of work. That he knew all the conditions attendant on this character of work, at this particular time, and had a full opportunity to know, and with actual knowledge thereof, voluntarily placed himself in a position of danger and assumed the risk incident to the act which he was about to perform, and that his injury and death resulted from a risk which he assumed and which he fully understood, and which by the exercise of ordinary care, he could have known and understood and could have avoided.

"4. Further answering the plaintiff's petition herein, and for further defense, the defendant adopts all the allegations of the second and third defenses hereinbefore pleaded, and in addition thereto says: That the plaintiff's intestate was injured and killed not by the want of any care on the part of the defendant, but that his injury resulted directly and proximately from his own want of care, as follows: That the defendant and its servants were not at the time of the injury engaged in any construction work; were not at the time of the injury using the place or the instrumentalities which the defendant furnished, as a place to work, but were engaged at the time in demolishing and tearing down a structure, and that after all the hoops or bands around said tank had been removed except the lower one, the plaintiff's intestate was cutting the rivets from the lower band or hoop and said rivets were all or practically all cut, and he took the chisel to drive it in at the point where the two ends of said hoop or band were joined, and that he was instructed and directed by his foreman and his associates not to use said chisel for the said purpose, and the foreman directed one of his fellow workmen to get a pick and split one of the staves near the bottom, so that the water would be released therefrom before the hoop was pulled off, and so that the outward pressure against said staves would be decreased, and said fellow servant had in fact gone to procure a pick for the purpose of splitting said stave, when the plaintiff's intestate inserted the chisel at the joint, as aforesaid, and struck the same with a hammer, thereby loosening said band or hoop and causing the staves of said tank to fall outward and upon him, and that plaintiff's intestate's injury re-

sulted directly and proximately as the result of his own want of ordinary care as aforesaid.

"Wherefore, the defendant, having fully answered, prays to be hence dismissed, for its costs herein, and for all proper relief."

Said cause went to trial before a jury. The attorney for the plaintiff made an extensive statement to the jury supplementing the allegations of the petition.

At the close of the plaintiff's evidence, the attorney for the defendant company demurred thereto. The same was overruled by the court, whereupon the defendant company introduced the evidence of Earl Gay, the purported vice principal. Whereupon the attorney for the defendant company moved the court for an instructed verdict, which motion was by the court overruled.

The court gave to the jury 18 instructions, and the attorneys for the defendant company objected and excepted to instructions Nos. 5, 7, 8, 9, 10, 13, and 14.

It appears from the record that, after the court had read his charge to the jury, the counsel for the defendant company requested of the court the giving of 23 specially requested instructions, of which 23 specially requested instructions, it appears from the record, Nos. 16, 19, and 21, were given, and that the three so given are definitions of what it takes to constitute a vice principal. This manner of presenting requested instructions to the trial judge is discussed in the case of Mills, Receiver, v. Hollinshed, 82 Okla. 250, 200 Pac. 200. See, also, in this connection, paragraph 61, page 802, 14. R. C. L.

The jury returned a verdict in favor of the plaintiff below and against the defendant below in the sum of $12,000, and thereafter the defendant below filed a motion for a new trial, setting up 19 assignments of error, which included assignment No. 12, which assigns error of the court in refusing to give each of the 23 specially requested instructions.

The motion for a new trial was overruled, and the cause appealed by the defendant company to this court.

We will refer to the parties in this appeal as follows: The plaintiff in error will be referred to as the defendant company and the defendant in error as the plaintiff below.

To show the manner in which defendant below has handled these numerous and alleged errors in its brief, we quote the following, pages 41 and 42, of his brief under

the heading of "Argument":

"Earl Gay, under the allegations of the petition, the plaintiff's evidence, and all of the uncontroverted evidence, was a fellow servant of the deceased.

"In order to obviate useless and confusing repetition in presenting our argument that the court erred in many particulars, we shall undertake under this single heading of the brief, to demonstrate that by the allegations of the petition which, of course, conclusively bind the plaintiff, and by the evidence introduced on the part of the plaintiff, and by all of the evidence introduced in the action, that Earl Gay, an employe of the defendant, was a fellow servant of the deceased, and that because thereof it becomes true:

"First. That the petition does not state a cause of action.

"Second. That the court erred in not sustaining the demurrer of the defendant to the evidence introduced on the part of the plaintiff.

"Third. That the court erred in not sustaining the motion of the defendant at the close of all of the testimony to peremptorily direct the jury to return a verdict in favor of the defendant.

"Fourth. The court erred in not sustaining the objection of the defendant to the statement made by the plaintiff's counsel, to the general effect that Gay was a vice principal of the defendant.

"Fifth. The court erred in overruling the motion for a new trial of the defendant.

"Sixth. The court erred in giving several instructions and in refusing several requested instructions, which we will separately discuss.

"The court will, therefore, please consider the argument presented under this heading as bearing upon all of the foregoing assignments of error, and as going to each of the foregoing assignments of error."

The first proposition discussed by the defendant below, plaintiff in error herein, is that the petition of the plaintiff below did not state a cause of action, in that there are certain admissions, declarations, and statements therein which under the authorities adduced, they contend, bound the plaintiff. It is contended that the plaintiff below admitted herself out of court, inasmuch as she admitted that Earl Gay was a fellow servant of the deceased, A. B. Berry, and that hence, under the allegations of the petition, there could be no cause of action stated against the defendant below.

Under the holding that we shall make in this case, however, it makes no difference whether Earl Gay was or was not a fellow servant, since we are going to hold that the facts in this case, as proved under the allegations of the petition, are sufficient to raise the question of primary negligence upon the part of the defendant below, in that it failed to perform a primary duty that was nondelegable and for the breach of which it became liable, unless the facts show contributory negligence or an assumption of risk within the legal significance of those terms, and which we have no right under the laws of this state and the Constitution thereof to review; that being a matter for the jury.

At the beginning of this case we are going to set out herein the following list of cases upon the law of negligence, the bulk of which, as may be seen, are Oklahoma opinions. The giving of this array of authorities, we think, is advisable for the reason of the many important questions raised by this appeal and to settle, if possible, the question if this court is definitely committed on the question of what it takes to constitute a vice principal under the law of Negligence:

Kreps et al. v. Brady, 37 Okla. 754, 133 Pac. 216; St. L. & S. F. R. Co. v. Rushing et al., 31 Okla. 231, 120 Pac. 973; Choctaw Electric Co. v. Clark, 28 Okla. 399, 114 Pac. 730; Mullhoff v. C., R. I. & P. R. Co., 15 Okla. 540, 82 Pac. 733; Reummeli-Braun Co. v. Cahill, 14 Okla. 422, 79 Pac. 260; Chicago, R. I. & P. Ry. Co. v. Jackson, 61 Okla. 146, 160 Pac. 736; Chicago, R. I. & P. Ry. Co. v. Duran, 38 Okla. 719, 134 Pac. 876; Chicago, R. I. & P. Ry. Co. v. Dizney, 61 Okla. 176, 160 Pac. 880; Chicago, R. I. & P. Ry. Co. v. Clark, 46 Okla. 384, 148 Pac. 998; Chicago, R. I. & P. Ry. Co. v. Pitchford, 44 Okla. 197, 143 Pac. 1146; Chicago, R. I. & P. Ry. Co. v. Nagle, 55 Okla. 235, 154 Pac. 667; Chicago, R. I. & P. Ry. Co. v. Schands, 57 Okla. 688, 157 Pac. 349; Chicago, R. I. & P. Ry. Co. v. Felder, 56 Okla. 220, 155 Pac. 529; Okla. Railway Co. v. Milam, 45 Okla. 742, 147 Pac. 314; Choctaw Cotton Oil Co. v. Pope, 47 Okla. 383, 148 Pac. 170; New et al. v. McMillan et al., 79 Okla. 70, 191 Pac. 160; Kanotex Ref. Co. v. Bonifield, 74 Oklahoma, 183 Pac. 970; Neversweat Min. Co. v. Ramsey, 84 Okla. 128, 202 Pac. 787; Sulzberger & Sons Co. v. Strickland, 60 Okla. 158, 159 Pac. 833; Petroleum Iron Wks. Co. v. Bullington, 80 Okla. 43, 193 Pac. 980; Ardmore Oil & Mill Co. v. Barner, 72 Oklahoma, 179 Pac. 932; E. Van Winkle Gin & Mach. Co. v. Brooks, 29 Okla. 351, 116 Pac. 908; Riter-Conley Mfg. Co. v. O'Donnell, 64 Okla. 229, 168 Pac. 49; Wichita Falls & N. W. Ry. Co. v. Groves, 81 Okla. 34, 196 Pac. 677; Dickinson v. Cole, 74 Oklahoma, 177 Pac. 570; McCabe & Steen Const. Co. v. Wilson, 17 Okla. 355, 87 Pac. 320; Okla. Portland

Cement Co. v. Brown, 45 Okla. 476, 146 Pac. 6; Ft. Smith & W. Ry. Co. v. Ketis, 26 Okla. 696, 110 Pac. 661; Sulzberger & Sons Co. v. Castleberry, 40 Okla. 613, 139 Pac. 837; Planter's Cotton & Gin. Co. v. Penny, 53 Okla. 136, 155 Pac. 516; Clark v. St. L. & S. F. Ry. Co., 24 Okla. 764, 108 Pac. 361; Wolverine Oil Co. v. Kingsbury, 66 Okla. 271, 168 Pac. 1021; Anthony v. Bliss, 39 Okla. 237, 134 Pac. 1122; Barnsdall Oil Co. v. Ohler, 48 Okla. 651, 150 Pac. 98; Millen v. Pac. Bridge Co. (Ore.) 95 Pac. 196; Miller v. Inman (Ore.) 66 Pac. 713; Galvin v. Brown (Ore.) 101 Pac. 671; Carilla v. U. S. Const. & Finance Co. (Kan.) 106 Pac. 1050; St. Louis & S. F. Ry. Co. v. Johnson (Kan.) 86 Pac. 156; Webber v. Wichita Water Co. (Kan.) 130 Pac. 661; Coffeyville Vitrified Brick Co. v. Shanks (Kan.) 76 Pac. 856; Brice-Nash v. Barton Salt Co. (Kan.) 98 Pac. 768; State of Iowa v. Smith (Iowa) 106 N. W. 187, 4 L. R. A. (N. S.) 539; Kuykendall v. Fisher (W. Va.) 56 S. E. 48, 8 L. R. A. (N. S.) 94; Culbertson v. Ala. Const. Co. (Ga.) 56 S. E. 765, 9 L. R. A. (N. S.) 411; Pullman Palace Car Co. v. Smith (Tex.) 13 L. R. A. (N. S.) 215; Marelli v. Twohy Bros. et al. (Mont.) 170 Pac. 757; McLane v. Head & Dowst (N. H.) 58 L. R. A. 462, dissenting opinion by Remick, Justice; O'Neill v. Great Northern Ry. Co. (Minn.) 51 L. R. A. 532; St. L. & S. F. Ry. Co. v. Moore et al. (Miss.) 58 South. 471, 39 L. R. A. (N. S.) 978; Lewis, Hubbart & Co. v. Montgomery Supply Co. (W. Va.) 52 S. E. 1017, 4 L. R. A. (N. S.) 132; Wilson v. Merry, The Law Reps., vol. 1, S. & D. Appealed Cases; Crispin v. Babbitt, 81 N. Y. 516, 37 Am. Rep. 521, and dissenting opinion by Earl, Justice.

Before taking up a discussion of the law and facts bearing upon the question of primary negligence and bearing upon the holding that there was evidence of a breach of a primary and nondelegable duty by defendant in this case, we will state our views and interpret the holdings of our own court upon the question as to whether this court is committed to the rule as to what constitutes a vice principal as laid down in the cases of Reummeli-Braun Co. v. Cahill, and Mullhoff v. C., R. I. & P. Ry. Co., heretofore cited in the list. These are Oklahoma Territory cases, and which have adopted the rule as to the vice principal as laid down by the Supreme Court of the United States in the cases of B. & O. Ry. Co. v. Baugh, 149 U. S. 368, 37 L. Ed. 772; Martin v. A., T. & S. F. Ry. Co., 66 U. S. 399, 41 L. Ed. 1051; and Railroad Co. v. Hambly, 154 U. S. 349, 38 L. Ed. 1009.

This rule of the federal courts defining what constitutes a vice principal is set out in the case of Reummeli-Braun Co. v. Cahill, as follows:

"1. In order to constitute a manager or superintendent of a manufacturing plant a vice principal, for whose negligence in the management thereof the master will be liable for personal injury to any of those employed under him, and who are subject to his direction and control, the master must confer upon such manager or superintendent the entire and absolute management of the entire business, or of an entire department thereof, retaining no oversight and exercise no discretion of his own as to the conduct of such business, except that it is the positive duty of the master to use reasonable care in providing safe tools, machinery, and appliances to work with, a safe place to work in, safe material to work on, and safe fellow servants or co-employes, and, if the business is such as to require it, to provide safe and proper rules and regulations for the conducting of the same. Negligence in the performance of any of these positive duties will render the master liable, without regard to the standing or authority of the employe through whose fault the injury is occasioned. If the injury is not the result of an omission to perform one of these positive duties of the master, but is occasioned by the negligence of one in charge of the manufacturing part of the plant, such a one will be deemed a fellow servant with the person injured, even though he has power to employ and discharge hands and to oversee the men and direct the work, unless his authority in his department is entire and absolute. If he is subject to the control of one over him in the management of his department, he is a fellow servant with those under him."

The case of McCabe & Steen Construction Co. v. Wilson, heretofore cited, was an Oklahoma Territory case also, but the question of vice principal was not involved in that case, since the court held that the railroad company had failed in a primary duty, that of providing a reasonably safe place in which to work.

Choctaw Electric Co. v. Clark was a case rendered by the court since statehood, and the question of vice principal was not directly involved in that case, and it turned upon the question of failure of defendant to furnish a safe place to work.

The next case was of VanWinkle Gin & Machine Co. v. Brooks, heretofore cited, decided since statehood. In this last case Justice Kane, writing the opinion, adopts the rule laid down by the federal courts, and the Justice closes said case with this statement:

"As this case was pending on the advent of statehood, the Oklahoma and United

States Supreme Court cases cited are controlling on this court"
—and seems to have adopted the federal rule as to vice principal in deciding the case for that reason.

The next case is that of Kreps et al. v. Brady, opinion by Commissioner Brewer, rendered since statehood, and one of the propositions involved in the case was as to whether section 36, art. 9, of the state Constitution, abrogating the common-law doctrine of the fellow servant in the case of an employe of a railroad, street railway. and mining companies was not repugnant to the equal protection clause of the 14th amendment to the federal Constitution; and another question was as to whether drilling a well in search of oil or gas was mining and within the meaning of said section. The constitutionality of the provision was upheld, and it was held that drilling for oil was not mining.

Another question involved in this last cited case was that of fellow servant, the same as is raised by the argument of counsel in this case, but an investigation of the case shows that under the facts as to whether the injury was caused by a fellow servant. a vice principal, or a superior servant could be held to be involved, since the facts showed that the two parties doing the work stood upon an exact equality and neither seemed to be boss or to be in control of the other.

The Commissioner quoted from the Oklahoma Territory cases we have referred to. The following quotation indicates, however, that it was not the Commissioner's purpose under the facts of the case to decisively commit the court to the federal rule, and even in effect states that the liberal rule did not save the case, as shown by the following quotation from page 766, 37 Okla., page 221 of 133 Pac.

"This case follows the case of Reummeli-Braun Co. v. Cahill, 14 Okla. 422, 79 Pac. 260. and Mollhoff v. C., R. I. & P. Ry. Co.. 15 Okla. 540, 82 Pac. 733, decided by the Oklahoma Territorial Supreme Court, and while the injury in the VanWinkle Case occurred prior to statehood, as has been suggested. even a most liberal expansion of the rule therein announced would not avail to save this case, if we are to remain within the current of judicial decisions. See, also. Erickson v. Victoria Copper Mining Co., 130 Mich. 476, 90 N. W. 291."

These authorities are cited and quoted and made the basis of the contention of the attorneys for the defendant company that

this court is committed to the federal rule as to vice principal. Then the brief of the defendant company takes up the case of Choctaw Cotton Oil Co. v. Pope, and quotes the first paragraph of the syllabus of said opinion, which syllabus we hold to overturn the federal rule. The language of said syllabus is as follows:

"Where an employe is in charge of the master's business or any department thereof, whose duties are exclusively supervision, direction and control of the work over a subordinate employe engaged therein, whose duty it is to obey him, he is a vice principal, notwithstanding he may be subject to general orders or superintending control of a general manager."

It must be borne in mind at this point that the federal rule states that to constitute a vice principal he must not be subject to control by higher authority, while the rule laid down in the above syllabus states that he may be a vice principal notwithstanding he may be subject to general orders or superintending control of a general manager.

The brief then takes up the case of Wolverine Oil Co. v Kingsbury, heretofore cited, which approves the principle laid down in Choctaw Cotton Oil Co. v. Pope, just cited and quoted.

The next case discussed in the brief of the defendant below, plaintiff in error, is Kenotex Refining Co. v. Bonifield, heretofore cited. This last case did not involve the question of vice principal at all. It involved the question of a primary duty of the defendant company in that it was charged that it had failed to use ordinary care in hiring fellow servants, and the case then went off on the question of pleading and failure of proof to show the necessary elements of this special question of negligence.

We think that the cases of Choctaw Cotton Oil Co. v. Pope and Wolverine Oil Co. v. Kingsbury commit this court to the superior servant theory, and that the federal theory has been repudiated.

If there is any doubt as to whether these cases had that force and effect, there can be no question but that this court has been committed to the superior servant theory in the case of Ardmore Oil & Milling Co. v. Barner, heretofore cited, quoting from page 934:

"Under plaintiff in error's first proposition it is contended also that T. H. Fuller was not a vice principal, and therefore the milling company was not liable, such contention being based in the main on the assumption that he was not a superin-

tendent; that he did not hire and discharge employes. The testimony, however, shows that he did sometimes employ laborers and sometimes discharge them. but most always sent them to the superintendent. But, aside from this testimony, if it were a fact that he never employed any laborer and never discharged any, and had no authority to hire or discharge any, or that he was forbidden to exercise any such authority, the fact remains undisputed that he was foreman of the work in charge and directed the manner of the work and that the master itself, the milling company, spoke through him in giving directions to the laborers. This made the master liable for injuries resulting from negligence or carelessness on the part of the foreman."

We will now take up and consider some of the principles and distinctions involved as to when and when not a master should be held liable for injury to a servant and as bearing upon the question of superior servant and vice principal. The principles that we discuss are discussed in some one of the authorities that we have already cited.

The master contends that his rights have been encroached upon by modern cases in two ways: First, by broadening and expanding the theory of vice principal and by the adoption of the superior servant rule; second, by adding to and enlarging the primary and nondelegable duties of the master.

The champions of the servant contend that the progress and development of social justice justifies these two expansions, and that these enlarged rules are based upon justice and reason.

One of the strongest presentations of the rightness and justness of the expansion of these two rules is set forth in a dissenting opinion to the case of McClain v. Head & Dowst Co., heretofore cited, dissenting opinion by Remick, Justice.

In connection with the proposition of the importance of dissenting opinions we take the following from LaBatt's Master and Servant, page 2, vol. 1:

"In the second place, the difficulty of determining to which of two or more recognized rules the rights of the parties ought, in any given instance, to be referred, is unquestionably greater in this than in any other class of cases. In this connection, the numerous dissenting opinions in the reports, and the reasons assigned for the conclusions arrived at, are very instructive"

—and then in a note is the following:

"See, for example, such a case as Thomas v. Missouri Pr. Co. (1891) 109 Mo. 187, 18 S. W. 980."

Again, LaBatt in his work on Master and Servant, vol 2, page 1566, in discussing dissenting opinions, has this to say:

"Minority opinions so seldom receive any attention from the judge, who is intrusted with the task of stating the conclusions of the majority, tha the omission of Judge Rapallo to notice Judge Earl's criticism of the theory which was deemed to be a bar to the plaintiff's action is not at all surprising. But it is less easy to understand why the lucid and forcible arguments of the latter judge should have made so little impression upon courts in other jurisdictions, that. so far as the number of decisions goes, the doctrine which he combated must now be regarded as the more authoritative. In order to draw the attention of the profession once more to the reasoning of this distinguished jurist, some lengthy extracts from his opinion are subjoined."

The dissenting opinion of Judge Earl referred to in the above paragraph was a dissent in the case of Crispin v. Babbitt, heretofore cited in our list. Both the Crispin and McClain Cases, in which the two dissenting opinions to which we refer were written. were negligence cases and involved a consideration of the questions of vice principal, contributory negligence, assumption of risk. and providing a safe place and method of work. The first is a New York case, the latter a New Hampshire case.

In the case of Brick-Nash v. Barton Salt Co.. heretofore cited in our list. Justice Mason of the Kansas Supreme Court pays this tribute to Justice Remick's dissenting opinion :

"In the former case, however, there is a strong dissenting opinion in which the authorities are carefully reviewed in what seems a successful effort to show the doctrine, repudiated by the majority of the court, is in accordance with precedent as well as with reason."

We are giving this attention to the dissenting opinions to show what courts think of dissenting opinions, at least what they think of some dissenting opinions, and to show that we are not alone in our high estimation of Judge Remick's opinion.

The question involved in the case was as to whether it was the primary and nondelegable duty of the master to give warning, and the principal facts are given in the quoted portions. To express Justice Remick's view of the progress of this phase of the law of negligence, we take the following from page 496 of 58 L. R. A.:

"As an original question viewed in the light of natural reason and justice, I think all will agree that when a master, through

his foreman in charge, orders a servant to work in a deep trench, caring for earth and stones which are being dumped into it from a point above, and outside of the line of his vision, assuring him by express declaration as well as by previous practice of warning, and by the implication, arising from the nature and necessity of the service, that he will be safeguarded by warning before each load, he should be held liable to the servant, who, while proceeding with the work in accordance with the foreman's direction, and in reliance upon such assurance and previous practice of warning, is injured by the neglect of the foreman to give such warning. But it is suggested that this conclusion, so reasonable and just in the abstract, is not permissible in the present case, because it is claimed that the neglect of a fellow servant, for which, according to the doctrine declared by Chief Justice Shaw in Farwell v. Boston & W. R. Corp., 4 Met. 49, 38 Am. Dec. 339, announced in 1842 and generally adopted in England and America, the defendant is not liable. There is neither disposition nor occasion in the present case to question the soundness of the general principle underlying that decision; but when an extreme and uncalled for application of it is urged, to the prevention of manifest justice, it is not improper to observe that the doctrine was announced with hesitation by the learned Chief Justice (Farwell v. Boston & W. R. Corp., 4 Met. 55, 61, 62, 38 Am. Dec. 339); that it has been condemned as unphilosophical by the ablest thinkers (Pollock, Torts, 94); that it was never accepted outside of England and American (Id. 89); that it has been substantially nullified by legislative action in the former and essentially modified, if not abrogated by statute in many of the states of the latter, country, including the commonwealth in which with doubtful accuracy (note to Nolan v. New York, N. H. & H. R. Co. [Conn.] 39 Atl. 128) it is said to have been first declared; and finally that, where it is still upheld, judicial decisions are in hopeless and irreconcilable confusion respecting its application (Johnson v. Boston Tow-Boat Co., 135 Mass. 209, 211, 212, 46 Am. Rep. 458; Rogers, v. Ludlow Mfg. Co., 144 Mass. 198, 59 Am. Rep. 68, 11 N. E. 77; Haskell v. Cape Ann Anchor Works, 178 Mass. 485, 59 N. E. 1113; Darrigan v. New York & N. E. R. Co., 52 Conn. 285, 52 Am. Rep. 590; Nall v. Louisville, N. A. & C. R. Co., 129 Ind. 260, 28 N. E. 183, 611; Chicago, M. & St. P. R. Co. v. Ross, 112 U. S. 377, 28 L. Ed. 787, 5 Sup. Ct. Rep. 184; Baltimore & O. R. Co. v. Baugh, 149 U. S. 368, 37 L. Ed. 772, 13 Sup. Ct. Rep. 914). It is apparent from these observations that no harmonious and consistent doctrine is involved, but an 'intricate and clumsy state of things' (Pollock, Torts, 94) against which Legislatures and courts are on the move (note to Nolan v. New York, N. H. & H. R. Co. [Conn.] 39 Atl. 128.)

Under these circumstances, while accepting the general doctrine, there would seem to be neither occasion nor justification for going into refinement to invoke it when the universal sense of justice must revolt from its application."

Still discussing this theory of the development of the law and his conclusions, we give the following from page 468, 58 L. R. A.:

"Belleville Stone Co. v. Mooney, 61 N. J. L. 253, 39 L. R. A. 834, 39 Atl. 764. It was as inherently and permanently necessary as any instrumentality demanded by the service, for the safety of the place, of whatever name or kind. Haskell v. Cape Ann Anchor Works, 178 Mass. 485, 59 N. E. 1113. It was so obviously indispensable that it must have been contemplated in the contract of employment. It was far more necessary than the warning required in the form of telltales, to protect against the danger of overhead bridges, because in the trench, where he could not see, the plaintiff was powerless to protect himself."

We give the following short excerpt from page 468 of 58 L. R. A., for the reason that it briefly illustrates a fundamental principle and shows under the superior servant theory where the line of liability of the master ceases:

"It follows that, for neglect to give warning that a load was to be dumped, the master is liable; while if the injury had resulted after and in spite of warning, from the negligence of one of the teamsters in the process of dumping a load, the master would not have been liable."

Touching upon the question of how the earlier opinions came to emphasize the rights of the master and to slight those of the servant, LaBatt, in his 1st volume, on pages 2 and 3, says:

"The third, and perhaps the most prolific, source of uncertainty and discrepancy is the accident of litigation from which it resulted that, in the earliest cases in which the extent of a master's responsibility was investigated, the questions presented were discussed from the standpoint of the servants' assumption of the risks of the employment, and not from that of the master's duty to protect the servant against those risks. The doctrines enunciated under such circumstances were such as naturally tended to emphasize the disabilities of the servant rather than the obligations of the master, and the subsequent evolution of the law has consisted essentially in a process of defining and explaining the qualification to which the sweeping general rules which were originally laid down are subject. Under any circumstances such a process must inevitably produce many inconsistent decisions and unsatisfactory distinctions, and in

the present instance it has resulted in a doctrinal confusion even worse than usual, owing to the fact that it has been carried on simultaneously in a large number of separate states, and the question how far the various proposed limitations of principles should be admitted has been answered in many different ways."

We have cited in our list of cases the English case of Wilson v. Merry, which was a case that seemed to have embodied the evil referred to by LaBatt in the above quotation, and resulting from emphasizing the assumption of risk of the servant, to the neglect of the master's duties toward the servant. The writer of this opinion has read the opinion of Wilson v. Merry and the injustice of the opinion, in the light of the facts of that case, and of the modern holdings, is very manifest.

We give the following further quotation from the dissenting opinion of Remick, Justice, for the reason that it expresses his idea of the federal theory of vice principal, which was the basis of the Oklahoma Territory opinions, and also expresses his opinion of the case of Wilson v. Merry, found on page 469, 58 L. R. A., as follows, to wit:

"Attention has been called to decisions of the Supreme Court of the United States in support of the nonsuit in this case. Northern P. R. Co. v. Peterson, 162 U. S. 346, 40 L. Ed. 994, 16 Sup. Ct. Rep. 843; Martin v. Atchison, T. & S. F. R. Co., 166 U. S. 399, 41 L. Ed. 1051, 17 Sup. Ct. Rep. 603. Attention might also have been called to Alaska Treadwell Gold Min. Co. v. Whelan, 168 U. S. 86, 42 L. Ed. 390, 18 Sup. Ct. Rep. 40, to the same purpose, and with even greater effect, since that case more nearly resembles the present one. It is weakened, however, as an authority, by the fact that the Chief Justice and Mr. Justice Harlan dissented, and by the further fact that, like the opinion of the majority in the present case, it cites, and evidently rests upon the doctrine of, Wilson v. Merry, L. R. 1. H. L. Sc. App. Cas. 326, 332, which has been elsewhere repudiated so far as it applies to circumstances like those in this case. Jaques v. Great Falls Mfg. Co., 66 N. H. 482, 13 L. R. A. 824, 22 Atl. 552; Davis v. Central Vermont R. Co., 55 Vt. 84, 89, 94, 45 Am. Rep. 68, 11 N. E. 77; Ryalls v. Mechanic's Mills, 150 Mass. 190, 194, 5 L. R. A. 667, 22 N. E. 766; Buswell, Personal Injuries, 193. It is not improbable that more of the authorities seeming to sustain the nonsuit in the present case were the result of applying the doctrine of Wilson v. Merry, without sufficiently regarding the modification it has undergone by the trend of modern authority. See Stevens v. Chamberlin, 51 L R. A. 513, 40 C. C. A. 421, 100 Fed. 378, 383—a suit arising in this district, and decided in the

Circuit Court of Appeals, where Wilson v. Merry is expressly recognized as the basis of the federal decisions. See, also, note to O'Neil v. Great Northern R. Co. (Minn.) 51 L. R. A. 564-572, where the repudiation of the doctrine of Wilson v. Merry by the great weight of American authority is clearly shown."

To illustrate to what nice distinctions the relation of master and servant bearing upon the question of negligence has gone, we desire to discuss briefly a very interesting Oregon case, that of Galvin v. Brown & McCabe, cited in our list. It bears directly upon the question of vice principal and the superior servant rule, assumption of risk and contributory negligence. Michael Galvin was a stevedore, assisting in the loading of lumber vessels in the city of Portland. Galvin with other laborers was in the hold of the vessel below the hatchway to receive, unload, and stack what was called "sling-loads", delivered from the lumber platform.

The lumber being loaded was square pieces. The sling-loads were pulled by a pulley, suspended over the hatchway, and lowered into the same. The lumber was placed on a rough platform some 60 feet from the hatchway. The laborers who were on the platform for the purpose of fixing the loads were placing four timbers in the loads. The loads then were clamped with a chain or rope looped around the lumber, and drawing taunt over the corners of the four timbers held them in place. The four timbers constituted a safe sling-load. The defendants had 20 vessels to load with timber, and one Mathew Troy was in charge of this work, either as a vice principal, boss, or superior servant. There being a rush to hasten the loading of the vessels, Troy came along and ordered the fellow servants of Galvin to put five timbers in the load instead of four, as theretofore. The laborers protested that that was an unsafe sling-load, and dangerous, but Troy insisted, and the five timbers were placed in the load, three timbers on the bottom and two on the top. Two loads with five timbers being let down safely, the third one was being let down, when the middle timber of the three lower timbers slipped out, fell and struck Galvin, and from the effects of the injury, he died. The difference in the safety of the four-piece sling-load and the five-piece sling-load is very manifest to every one. There is no question but that Troy in this case was vice principal or a superior servant. The writer of the opinion seems to have adopted LaBatt's theory, as hereinafter shown, holding him to be a superior servant. The writer of the opinion also seems to have adopted

and applied to this case the following principle:

"A master is not required to superintend and direct the manner of the execution of minor details of the work; and, where such has been negligently done by the servant to the injury of a fellow servant, the master would not be liable for failure to prescribe a rule or regulation."

We do not, however, think this principle applied in the cited case, while we agree that the same is the law where the facts do apply. We do not think that the manner of fixing these sling-loads was a detail or work, but involved a question of a safe method of performing the work, which theory we hereinafter develop to show primary negligence in the instant case.

In the cited case, the opinion seems to be written upon the theory of a superior servant directing the detail of the work to be done in a certain way, which was a careless way, was the proximate cause of the injury, and manner of fixing the sling-loads being directed by Troy, the vice principal or superior servant, the company was bound. A more careful investigation of the opinion indicates, however, that it was probably written upon both theories, as shown by the following quotations from page 676, 101 Pac.:

"The duty was upon the corporation to keep the place where Galvin was at work in a reasonably safe condition consistent with the character of work to be done by him; and, if by its negligent act that duty was violated, it must assume the burden. Brick Co. v. Shanks, 69 Kan. 310, 76 Pac. 856. In giving the order Troy was acting not only within his line of duty, but was in fact then the official representative of the corporation, and was performing an act with notice that it affected his duty towards the men in the hold of the vessel. 'If a master directs a servant to do certain work in a manner not reasonably safe, and the performance of the work in the manner directed is the proximate cause of injury to the servant, the master is guilty of actionable negligence.' 26 Cyc. 1153. While there are some decisions that absolve the master even from the results of complying with the negligent order of a vice principal, where such order relates merely to the details of the work, yet it is said in 2 LaBatt on Master and Servant, paragraph 541: 'There is an overwhelming weight of authority to sustain the doctrine that the liability to which the master is declared to be subject wherever "the negligent act is a direct result of the exercise of power conferred by the master, in the performance of a duty devolving by law upon him," is predicable in the case of orders issued in respect to work, whatever may be the precise object to which those orders may have relation. It is, in fact, difficult to see what more indisputable example there can be of an "exercise of authority" than the giving of such orders; and, for the purpose of affecting the master with liability in this instance. it is obviously quite immaterial whether the delinquent employe be a mere superior servant or a general departmental manager. According to the great majority of the cases, therefore, all that is necessary to fix liability upon the master is that the negligent order which caused the injury should be proved to be incident to the performance of the duties of his position. The order may be a negligent one because the servant is directed to use dangerously defective appliances, or to work in an abnormally dangerous place, or to do work in a dangerous manner, or to do something which, under the circumstances, will render the place of work abnormally dangerous for a fellow servant.'"

Paragraph 544, vol. 2. of LaBatt on Master and Servant, lays down the theory that the master is not bound by the acts of the vice principal or superior servant in performing purely manual acts or detail acts, in other words, acting as a common laborer himself and which act was negligent and resulted in injury to one of the laborers, whereas, if the vice principal or superior servant would direct one of the laborers to perform the act instead of doing it himself, the master would be bound. This theory seems to be supported by Illinois and Tennessee courts.

In paragraph 546, vol. 2, of LaBatt on Master and Servant, the proposition is laid down that the principal would be bound by the acts performed by the vice principal or superior servant, and this last theory seems to be adopted by the Ohio, Missouri, and Texas courts; and the author at the close of paragraph 547, page 1572, LaBatt on Master and Servant, vol. 2, makes the following comment:

"In both classes of courts, therefore, the refusal to allow recovery under the circumstances must bring us face to face with the same difficulty, viz., that such refusal is only justifiable on the assumption that the duty of a vice principal to avoid injuring his subordinates by manual acts is not one of those which the master, who would admittedly have been under a similar duty if he had himself participated in the work, may be conceived to have delegated to his deputy, and that no reasons have ever been judicially suggested why this assumption, rather than its converse, should be entertained. In default of such reasons, the present writer has no hesitation in saying that he considers the rul-

ings of the Illinois and Tennessee courts, as stated in paragraph 544, supra, to' be less correct in principal than those of the Ohio, Missouri, and Texas courts cited in paragraph 546, supra."

The discussion of these various principles has come to a very great length, probably more than was absolutely necessary, and the writer of this opinion may be a good deal as Tom Reed remarked about Theodore Roosevelt when Roosevelt was beginning his young and eager career as a reformer. Reed, in substance, remarked of him that he, Roosevelt, had grown enthusiastic over the sudden discovery of the Ten Commandments. The writer of this opinion may have grown enthusiastic over the sudden discovery of some elementary propositions in the law of negligence. We can, however, see nothing amiss in occasionally harking back to some fundamentals and getting our bearings.

It might be remarked that the law of negligence is growing less important in a state like the state of Oklahoma, by reason of the fact that under our Constitution the question of contributory negligence and assumption of risk is left to the juries to determine and cannot, hence, become a law question, and for the further reason that the common-law fellow-servant rule as affecting railroads and mining companies is abrogated by the Constitution; and for the further reason of the enactment of the Employers' Liability Act, which has been defined by recent decisions of this court to limit the jurisdiction of the law courts in negligence cases, to such negligence as results in death or is held to be willful and intentional negligence.

The law of negligence is still important and necessary to determine primary negligence in all cases in which the law courts have jurisdiction, and in considering alleged errors of the trial courts in ruling on pleadings, introduction of evidence, and in giving instructions to juries.

The superior servant doctrine is explained in paragraph 1447, vol. 4, LaBatt on Master and Servant, where the different definitions of the courts are given. It seems to be based upon the theory of agency, and where the directions given by such agent are within the scope of the agency, it binds the master.

Some courts seem to base it upon the power to hire, discharge, and direct, and it does not matter whether he is called superintendent, boss, or foreman, and none of the said definitions requires that he be independent of the general orders or the superintending control of some general manager or superintendent.

The plaintiff in error, defendant below, has raised objections to the sufficiency of the petition in this case, not by a demurrer, but by an objection to the introduction of evidence thereunder. This method of attack upon the petition does not seem to be favored by the courts. The first paragraph of the syllabus of the case of Sulzberger & Sons Co. v. Castleberry, 40 Okla. 613, 139 Pac. 837, reads as follows:

"Where the sufficiency of a petition is challenged solely by an objection to the introduction of evidence thereunder, such objection, not being favored by the courts, should generally be overruled, unless there is a total failure to allege some matters essential to the relief sought, and should seldom, if ever, be sustained when the allegations are simply incomplete, indefinite, or conclusions of law."

The following is taken from paragraph 1436, page 4160, of LaBatt on Master and Servant:

"In jurisdictions where the superior servant doctrine (par. 1447, et seq., post) is adopted, it is error for a trial judge to sustain a demurrer to a complaint which alleges facts indicating that the negligent employe controlled the injured plaintiff."

While the petition in this case is not as full and complete as the same should be, it is sufficient to meet the requirements as laid down by the preceding law, and under the method of attack directed against it.

An examination of the evidence in this case shows that Earl Gay, the purported vice principal or superior servant in this case, and the one who assigned this deceased to his work, was in control of this work, had the power to hire, discharge, and direct the men. There was no one else present on the works that had superior authority to him. There appears to have been a division superintendent some 40 or 50 miles away, and the evidence shows that the two men, Callahan and Berry, the deceased, were working on this water tank under the direction and control of Earl Gay, the purported vice principal or superior servant.

A discussion of the primary negligence in this case involves a consideration of the structure of the water tank and the circumstances surrounding this accident. The tank was constructed of timbers 16 feet long, some 2x2's, 2x3's, and 2x4's set upon end with a wooden bottom. These staves were held in place by 15 or 20 iron hoops, which were fastened by rivets, and at the place the hoops were fastened the ends of same lapped. At the time of this injury, there were some 20 inches or two feet of water in the tank.

This amount of water would exert some lateral pressure and make the timbers more liable to sudden collapse when the hoops were removed. There were no staves or dead timber, as some call it, on the inside. In the record there is something mentioned about nails being toed in with a view to holding the pieces together. Acting, as the evidence shows, under the direction and orders of this superior servant, Earl Gay, the two workmen, Callahan and Berry (Berry being the laborer who was injured and killed), commenced the tearing down of this tank; the general orders to the vice principal or superior servant in this case being to dismantle this oil station and remove it, which included the water tank. Callahan cut the first hoop, Berry the second hoop, and they alternated in this manner until all of the hoops were cut except the last one at the bottom, the cutting of which fell to the lot of Berry. The method of cutting the hoops was to cut the rivets, and the instruments used in this were a cold chisel and hammer. After the rivets had been cut, the chisel was used to wedge the ends of the hoops loose from the rivets, and this would release the hoop. At the time of the accident, Berry had cut the rivets, but had not yet pried the ends of the hoop loose from the rivets. As Berry finished cutting the rivets Gay spoke to him, saying: "Wait a minute. We will get a pick." And it was sought at this point to introduce into the record the reasons why Gay wanted the pick. It appears from the proffered proofs to have been for the purpose of breaking the staves at the bottom and thereby letting the water out of the tank. The court denied admission of this proof. After Gay had spoken to Berry in the manner just stated, Berry looked up, and it was at this time that the tank collapsed. Berry started to run for safety, ran into a wire fence, was struck upon the head by one of the staves and received an injury from which he afterwards died.

This evidence was sufficient to carry to the jury the question of the primary negligence of the defendant company. The tank was built of timbers towering almost three times the height of an average man, and under the directions of the boss this deceased assisted in removing the only support of these timbers. The devising of a safe method of doing the dismantling of this tank would suggest itself to any reasonable and sensible person. The writer of this opinion can think of several methods that would be simple and effectual in safeguarding those who were employed in this work. In the first place, an auger could have been used to bore holes in the bottom of this tank to let the water out and relieve the pressure. A substantial framework could have been built at the place where these laborers were of necessity compelled to work in order to accomplish their task that would have guarded them from falling timbers.

The principle of law involved in a question of primary negligence thus raised is laid down in 26 Cyc. 1151, 1153, subd. "C." The principle is adopted in Kansas in the following cases: Carrillo v. U. S. Const. & Finance Co.; Webber v. Wichita Water Co.; Coffeyville Vitrified Brick Co. v. Shanks; Nash v. Barton Salt Co., all heretofore cited in the list of cases. See, also, case of Jones v. American Warehouse Co. (N. C.) 49 S. E. 355.

The following are the second, third, and fourth paragraphs of the syllabus of the case of Carrillo v. U. S. Const. & Finance Co., heretofore cited:

"The obligation of the master to the servants to provide a reasonably safe method for the performance of their work is one of his nondelegable duties, the neglect of which imposes a liability for resulting injury, irrespective of any question of fellow service.

"Where an employe is injured while assisting in lowering a heavy piece of machinery down an inclined plane, and such injury is due to the negligent act of those in immediate charge of the work in failing to employ some mechanical device to control its movement, instead of undertaking to move it by hand, the employer cannot avoid liability upon the ground that the negligence was that of a fellow servant.

"The danger of attempting to lower a heavy piece of machinery down an inclined plane by hand is not so obvious that it can be said as a matter of law that a laborer assisting in the work assumes the risk of injury."

The following is taken from the body of the opinion in Corrillo v. United States Const. & Finance Co.:

"A further contention in support of the ruling of the trial court is that, assuming Carrillo's injury to have been received while acting within the scope of his employment by the company, he cannot recover because the negligence complained of was that of a fellow servant. One of the forms of negligence alleged in the petition was 'the use of insufficient appliances and help to restrain said car and pump from running too fast.' Under this allegation and the evidence it was a fair matter for the consideration of the jury whether the accident was not due to negligence in undertaking to let the pump down into the hold by hand, without the

use of a derrick, block, and tackle, or other mechanical device to insure its safe handling. If negligence existed in this respect, it was negligence in the general method of doing the work, not in a mere detail of its performance. The master's obligation to his servant to provide a safe method of work is one of his nondelegable duties, the neglect of which imposes a liability for any resulting injury irrespective of any question of fellow service. While there is some conflict in the decisions elsewhere (26 Cyc. 1154), such is the settled law of this state (Brick Co. v. Shanks, 69 Kan. 306, 76 Pac. 856; Brice-Nash v. Salt Co., 79 Kan. 110, 98 Pac. 768, 19 L. R. A. [N. S.] 749)."

There are five Oklahoma cases which support this theory, being the cases of Sulzberger & Sons Co. v. Castleberry; New et al. v. McMillan et al; C., R. I. & P. Ry. Co. v. Schands; Riter-Conley Mfg. Co. v. O'Donnell, heretofore cited. The first and second paragraphs of the syllabus of the case of C., R. I. & P. Ry. Co. v. Schands reads as follows:

"Although a servant assumes the known and obvious increased hazards of a work which, by reason of the character of the work, becomes more dangerous as the work progresses, a master in such case is not absolved from any duty to furnish a safe place to work, but must use ordinary care to make the place where his servants work as safe as it can be made under the conditions of the work to be performed.

"The fact that there may be dangers connected with the general class of work the servant is directed to perform, which ordinary care upon the part of the master cannot remove, does not excuse him from liability for injuries due to dangers which the exercise of ordinary care would remove."

The attorney for the defendant company, in his brief, seeks to avoid this phase of the principle adduced by invoking the principle involved in the Gravel Pit Cases, as defined by Mr. Justice Hayes in the case of Ft. S. & W. R. Co. v. Ketis, heretofore cited, and it is based upon the theory that the very nature of the employment and of the work involves an inevitable risk in that there is an inevitable and unavoidable increase in the risk due to the nature of the work. This principle cannot, however, be made to apply to the facts in the instant case. These dangers and risks were apparent when the method used in dismantling this tank is considered, and the lessening of the risk was reasonably possible by the exercise of ordinary care on the part of the master in devising a safe method of work. Therefore, neither does the other principle suggested by the defendant below,

plaintiff in error, in his brief, namely, that these risks arising as an incident to the constantly changing conditions in the demolition of a building or a structure are not such as the law holds the master liable for. This principle is discussed in the case of Riter-Conley Mfg. Co., heretofore cited; but before taking up the last case, we will consider briefly the case of C., R. I. & P. Ry. v. Nagle, 55 Okla. 235, 154 Pac. 667.

The plaintiff in this last case was injured by falling upon a nail in a plank in the bottom of a ditch. He was employed in assisting in clearing away a wreck upon the railroad. In that case, the court, after considering the facts, held as a matter of law that there was no primary negligence shown, since, under the facts and circumstances, notice to the company of the dangerous condition surrounding the work could not be attributed to the company, and under such circumstances that the company could not be held to have had an opportunity to safeguard the danger.

The true and correct principle is set forth in Riter-Conley v. O'Donnell, heretofore cited, by Justice Brett (and by the way, this involved also nails in a plank, the same as the case just discussed, but under circumstances entirely different, and in which last case the company was held to be liable for failing to exercise ordinary care to provide a safe place to work).

The discussion pertinent to the point we are considering is found on page 231, 64 Okla., pages 50 and 51, 168 Pac., as follows:

"The defendant insists that under the facts pleaded and proved in this case, if the place at which plaintiff was working at the time he received his injuries was unsafe, that the condition was one temporary and transitory, and that it was rendered unsafe by the plaintiff's fellow servants, and not by any fault or negligence of the defendant, and cites authorities to the effect that the master is not liable for injuries resulting by reason of transitory dangerous condiions which arise and change the condition of the place of work during the progress of the work in which the employes are engaged. This is undoubtedly a sound, just, and correct rule of law, thoroughly established. But to our mind, there is a marked distinction between the facts in the case at bar and the facts to which this rule of law is applicable. This rule excuses the master only where the very progress of the work causes the conditions surrounding the place of the work to change—where the change is temporary transitory, and is due and incidental to the progress of the work, and cannot be said to apply to the facts in the case at bar. Here the plaintiff and his associate workmen, called the 'bottom gang,

were directed to begin work on a separate and distinct tank (No. 5), which was 30 or 40 feet from where they had worked or where any one else was at work at the time. And the condition which resulted in the injury did not arise during the progress of their work, but was a condition that existed at and prior to the time they were directed to begin work upon this tank. The nail upon which · plaintiff stepped was not dropped there during the progress of his work on the bottom of this tank; its presence there was not due nor incidental to the progress of the work of building the bottom of the tank, but the board containing it, together with more than 200 other boards containing nails, had by direction of the master been scattered there five or six days before—so long that the sand shifted by the wind had covered this one and others, completely hiding them from view. Then it cannot be said that this was a mere transitory peril, incident to and occasioned by the execution of the work and it cannot be said under this state of facts, as shown by the evidence, that there was no evidence reasonably tending to show that the defendant was guilty of negligence.

"There are some dangers which ordinary care on the part of the master cannot remove, and for which the law does not hold him liable; but the law does not excuse him from liability for injuries due solely to dangers which the exercise of ordinary care would have removed. LaBatt on Master and Servant, p. 2475. In Barnett & Record Co. v. Schlapka, 208 Ill. 426. 70 N. E. 343, it is held that: 'The exception to the general rule as to the duty of the master to use ordinary care to provide a reasonably safe place to work, made where the character of the work is such that the relative safety of employes necessarily varies from time to time as the work progresses, and the work being done at times renders the place dangerous, applies only where the work being done necessarily renders the place dangerous, and not to a case where the danger could have been entirely obviated at a slight expense.'

"And in Casey v. Kelly-Atkinson Const. Co., 240 Ill. 416, 88 N. E. 982, the court says: 'Counsel says that the conditions in the construction of the bridge were changing, from time to time, in the prosecution of the work, and for that reason the law did not impose any duty upon the defendant to keep the place of Miller's employment reasonably safe. There is a rule of that kind, but it has no relation to this case, for the reason that the accident did not result from changing conditions in the prosecution of the work which made the place unsafe.'

"To the same effect is Bird v. Utica Gold Min. Co. et al., 2 Cal. App. 674. 84 Pac. 256. And the very language of the exception itself limits its application to cases only where the work being done at the time changes the conditions and necessarily

renders the place temporarily unsafe. Hence, it does not apply to the facts in the case at bar."

We do not think that the principle that is sought to be applied by the attorney for the defendant company. that the risks and dangers arising during the constantly changing conditions in tearing down buildings and structures, applies in this case. The changes that were coming could be measured from the beginning, and the risks could be arrived at from the beginning, and hence could be known, and it was reasonable to conclude that it was practicable to safeguard against them, and conclude, further, that the failure to do so was the failure to exercise that degree of care which the law places upon the master.

A good illustration of this principle would be this: In the construction or tearing down of a building, negligent nailing and negligent construction of scaffolding by the workmen would be one of the constantly changing duties; the negligence arising from this kind of work the master could not be held to be responsible for. But the failure of the master to furnish safe material, and if there were safe and unsafe methods of constructing this scaffolding, and the master failed to see that the safe method was used, then in that event he would be guilty of negligence.

It is useless to pursue this discussion further. We hold that there was sufficient evidence for the jury to hold the defendant company guilty of primary negligence in failing to provide a safe method of dismantling this tank. We will next take up the questions of error raised by the defendant company relative to the giving of certain instructions and the refusal to give certain requested instructions, by the trial court. The first instruction objected to is instruction No. 5, which reads as follows:

"You are further instructed that under the law and the evidence in this case the deceased was an employe of the defendant. and entitled to all the protection that the law gives to an employe, and in this connection you are instructed that the relation of the master and servant existed, and that it was the duty of the master, or the defendant in this case, to furnish its employes. or the deceased in this case a reasonably safe place to work, reasonably safe tools and appliances with which to work. and reasonably cautions and prudent co-workers with whom to work; and you are further instructed in this connection that if you find from the evidence in this case by a preponderance thereof that the deceased was injured or killed while in the exercise of ordinary care and prudence, and

in obedience to the orders of his superiors, and that such injury or death was the result of the negligence of his employer, acting through its vice principal, in instructing him to go to or perform duties in a dangerous place, or if in obedience to such orders or instructions from his superiors he was placed in a position of peril, then and in that instance your verdict should be for the plaintiff."

At the time of the accident, the deceased was in the act of cutting the last hoop, and the jury must have found the deceased was in a position of peril. The theory of the plaintiff below was that the deceased was there by direction of a vice principal or a superior servant, Earl Gay. The facts proved are sufficient to justify the jury in finding Earl Gay to be a superior servant, with authority to bind the defendant company. The effect of the allegations of the petition was to allege that the method pursued in dismantling the tank was unsafe. There is not much difference in calling it the method of doing the work and calling it an unsafe place to work. If the defendant failed to provide a safe method of doing the work, this in effect was the same thing as failing to provide a safe place in which to work. To repeat, while the instruction is not as clear and distinct as it should be, and a portion of the instruction is erroneous in that the court named duties as devolving upon defendant company that are not alleged and the breach of which was not alleged or supported by the evidence; and this, in effect, was the giving of an abstract instruction, yet we cannot say, after reviewing the record of this case, that the giving of this instruction probably worked injury to the defendant company. The rule controlling is laid down by the courts and is set forth in paragraph 49, pages 782-784, of 14 R. C. L., as follows:

"As the very purpose of instructions is to aid the jury in arriving at a proper verdict in the case, the jury should be informed in clear, plain, and concise terms as to the law which is applicable to the particular case under consideration, and it is improper and erroneous for a court to give instructions to the jury which are not applicable to the case in any of its phases, but which are mere abstract statements of the law. This rule holds good although the instructions contain correct statements in this respect, for the jury is not concerned with what the law may be generally, but only with that very small portion of it which must govern the particular matters under consideration. It is, then, the plain duty of a trial court to refrain from giving abstract instructions of its own motion, or at the request of either party. The principal

and very forcible objection to abstract instructions, however correct in themselves, is that they are necessarily misleading, in that they tend to draw the minds of the jurors away from the real facts in the case to something which they assume to exist, but which cannot be found in the record. Whether an abstract instruction will call for a reversal of a case depends on the determination of the question whether as a result of the instruction prejudice resulted to the complaining party. It is generally agreed that legal abstractions in a charge are not always hurtful and. unless it appears that they may have been so. the giving of them, while never to be approved, is not reversible error. But if an instruction. although unobjectionable as an abstract proposition of law, is calculated to mislead the jury and affect their conclusion upon the issue submitted to them. it will call for reversal. Still, while abstract instructions are not generaly ground for reversal. it is the better practice to omit or refuse instructions of that character."

Also paragraph 74, pages 815-817, of 14 R. C. L.:

"It is only when an erroneous instruction has resulted in prejudicing the rights of the complaining party that the judgment will be reversed, and it is the general rule that such action will not be taken by the appellate court for error in giving or refusing to give instructions, if the verdict is evidence right, or if it appears from the evidence that no other verdict could have been properly correct. Another rule well settled by the authorities is that erroneous instructions will not be ground for reversal where it clearly appears that the jury were not influenced thereby, as for instance, in the case of an error in giving an instruction as to the measure of damages, or in reference to negligence and contributory negligence, or that intoxication is an aggravation of the offense. where the jury inflicted the lowest punishment permitted by the statute. So any error contained in a misleading instruction may be cured by a special finding of the jury which clearly shows that they understood the instruction properly. Also where a crime is divided into degrees, if the court commits error in instructing the jury as to the higher degree of such crime and they return a verdict of guilty of the lower degree as to which they were properly instructed. the defendant cannot complain. And the rule has been stated to be that where a person on trial for murder. an error in the instructions as to the 'heat of passion' will not be prejudicial where the jury convict of murder in the first degree, especially where the evidence does not tend to make out manslaughter. It has been held. however. that an erroneous charge on murder in the first degree is not cured by a verdict finding the defendant guilty of involuntary manslaughter."

See, also, in this connection section 6005, Rev. Laws 1910.

In the case of Oklahoma Portland Cement Co. v. Brown, 45 Okla. 476, 146 Pac. 6, the court in that case had under review certain instructions given by the court in a negligence case. The court reversed said case for errors in the instructions. We are going to quote herein from page 488, 45 Okla., page 10, 146 Pac., the following portion of said opinion, wherein the court sets forth the reasons for such reversal:

"And so we say for the reason that the work in which plaintiff and his crew were engaged at the time he was injured was no more complex in its nature than to require them to take notice of the law of gravitation, and defendant, as a matter of law, and aside from its assumption of duty to warn, was not required to make rules concerning the work; and hence the court not only erred in charging the jury on an issue not raised by either the pleadings or the proof, but also erred in declaring the law thereupon. This is prejudicial, for the reason that the same was so often repeated in the charge as to lead us to believe the jury went off on it and found for plaintiff upon an issue not supported by the allegation or the proof. We say this for the reason that nowhere does the court charge on the theory heretofore stated; that is, that defendant would be liable should they find that defendant failed to warn plaintiff of the approach of danger pursuant to a system previously adopted for that purpose, and upon which customary warning he relied and was injured. Or upon the theory that, aside from defendant's duty to warn in the first instance, if defendant undertook to warn, and negligently failed so to do, in consequence of which plaintiff was injured, defendant was liable. And more, this case should be reversed for another reason. As often as was repeated said erroneous instruction, the court charged the jury that it was the duty of defendant to exercise ordinary care in providing plaintiff, not only a reasonably safe place to work, but reasonably safe appliances with which to work. As to appliances, this charge was error, for the reason that, although they were alleged to be improper, there was no evidence to support the allegation, and for the further reason that the appliances with which plaintiff and his crew had to work were shown to be proper, and there was no evidence introduced to prove or tending to prove the contrary.

"And so taking the charge as a whole, as it fails to appear that plaintiff prevailed on the only theory upon which he was entitled to recover, the same never having been instructed on by the court, and it appearing that he probably prevailed upon the theory that defendant had failed to exercise ordinary care to furnish him reasonably safe appliances with which to work, or upon the theory that he had failed to issue proper rules and regulations by which to work, and that those issues were wrongfully submitted to the jury, the cause is reversed and remanded for a new trial."

It appears from reviewing the reasons set forth in the above case that the court never instructed the jury upon the one question upon which the jury might have held plaintiff entitled to recover, and that this court concluded that he had recovered upon one of the grounds that the court had erroneously instructed the jury upon, and that is given as the reason for reversing the case.

In the said fifth instruction so objected to, the trial court enumerated the duties of a master toward a servant in a general abstract way, but gave no specific instructions thereon, but the specific instruction that followed later was given upon the duty alleged in the petition to have been breached, and which is supported by the evidence, hence the reasons for reversal as expressed in the preceding opinion do not exist in the instant case.

The next objection is to instruction No. 7, wherein the court undertook to define negligence in the following language:

"You are instructed that negligence is defined as a failure to observe, for the protection of the interests of another person, that degree of care, and precaution and vigilance which the circumstances justly demand, whereby such other person suffers injury or death."

This definition of negligence is in the exact language used by Judge Cooley in his work on Torts. It is said in 29 Cyc. 415, relative to this definition, as follows:

"The definition given by Judge Cooley in his work on Torts, and quoted with approval in many decisions, is perhaps the most comprehensive and accurate of any."

We are not disposed to reverse a case because the court used the definition of negligence in its instructions to the jury coming from such an authority as Judge Cooley and which has received the sanction of many courts.

The next objection is to instruction No. 8 given to the jury, which was as follows:

"You are instructed that if you find from a preponderance of the evidence that the work in which the deceased was engaged at the time of the accident which caused his death was dangerous or hazardous, and the deceased was inexperienced in such work and ignorant of the dangers incident thereto, and

such dangers were not apparent or obvious to an ordinary prudent person who was likewise inexperienced, then it was the duty of the defendant company to warn the deceased of such dangers for his own safety, and the failure of the defendant company to do so would constitute negligence."

This instruction is so palpably inapplicable to the facts and circumstances proved in this case that we will conclude that the jury did not consider the same, and hence the instruction cannot be held to have worked injury to the defendant company. There is no proof that we can see in the record tending to prove what experience this workman did have in the work of dismantling water tanks. The court furthermore instructed the jury by the plain language of said instruction that a warning was only necessary where the danger was not apparent. We have already held in this case that such dangers as were incident to the work assigned to this deceased were plain and palpable, and were conditions determinable from the beginning, and were not such as were made apparent from the details as the work progressed, and hence were in no sense latent or hidden dangers or risks of which the defendant had knowledge and of which the plaintiff was ignorant. We hold that it is not reasonable to conclude that the jury was affected by this instruction.

The next objection is to instruction No. 9, which is as follows:

"Contributory negligence is negligence on the part of the deceased amounting to want of ordinary care on his part, which, concurring in or co-operating with the negligent acts of the defendant is the proximate cause or occasion for the injury concerning which complaint is made; and in this connection you are instructed that contributory negligence is an affirmative defense and must be established by the defendant by a preponderance of the evidence in this case, before you can find the deceased guilty of contributory negligence; and you are further instructed, if you find from a preponderance of the evidence that the deceased was negligent and such negligence on his part amounted to a want of ordinary care and diligence such as would be exercised by an ordinary person under similar circumstances, and which negligence, concurring and co-operating with the negligent acts of the defendant, was the proximate cause of his injury and death, then your verdict should be for the defendant, and you will so find."

The particular objection of the attorney for the defendant company to the instruction is that it limits the jury in passing upon contributory negligence to a consideration of only the evidence adduced by the defendant company bearing upon that proposition, and that it denies the jury the right to consider any evidence adduced by the plaintiff below bearing upon the question of contributory negligence. While we do not think that a reasonable interpretation of the language of this instruction has the effect contended by the attorney for the defendant company, yet, even if it is held that it does, it cannot be contended that it denied the defendant company any right under this record.

An examination of the record shows that there was no proof adduced by plaintiff whatever tending to show any contributory negligence on the part of the deceased. There is no proof in the record showing that this deceased did any act contributing toward his injury except what he was instructed to do by the superior servant, Earl Gay, and the compliance with such request by the deceased would not be contributory negligence, but in the nature of assumption of risk, which is not, in this jurisdiction, a queston of law, but is a question for the jury.

In the case of St. L. & S. F. R. Co. v. Johnson (Kan.) 86 Pac. 156, the fourth paragraph of the syllabus reads as follows:

"An instruction which states that the burden of proof is upon the defendant to establish the defense of contributory negligence is not open to the objection that the jury might have been mislead when none of the evidence of plaintiff tends to prove contributory negligence."

To the same effect is the case of Planters' Cotton & Ginning Co. v. Penny, 53 Okla. 136, 155 Pac. 516.

The next error complained of by the counsel for the defendant company is that the court committed reversible error in refusing requested instruction No. 7, which was as follows:

"If you find from the evidence that Earl Gay, at the time the deceased was engaged in cutting and severing the last hoop on the tank, told deceased to wait a minute before said hoop was wholly severed, and that the deceased failed or refused so to do, and that his failure so to do caused the staves of the tank to fall, and the deceased to be injured, then you are instructed that the defendant cannot be liable for the failure of the deceased to obey the instruction and direction of Earl Gay to wait before proceeding to entirely sever said hoop."

This instruction was properly refused, because there is no evidence upon which to base the same. While there is evidence stat-

ing that Earl Gay, the superior servant, spoke to the deceased at the time he had cut the rivets on the last hoop, but before the ends had been wedged apart, saying, "Wait a minute and let us get a pick", the record shows that the only thing the deceased did after this statement by Gay was that he looked up. There is no evidence that he did anything else. and it was while he was looking up that the tank collapsed.

The next error assigned is that the court committed reversible error in refusing to give requested instruction No. 8, which was as follows:

"You are instructed that if the tank in question before anything was. done in tearing the same down, and before any of the hoops thereon, were severed, was not dangerous or hazardous, then you are instructed that the defendant was not guilty of negligence. in directing the same, the crew of men of which the deceased was a member, in tearing down said tank."

The refusal to give said instruction, under the holdings already made in this cause. constitutes no error. It can. have no application. We have held the evidence justified the jury in finding the defendant company guilty of primary negligence in that the company had failed to use a safe method in dismantling the water tank; that this was a primary and nondelegable duty and arose in connection with the work of dismantling the said tank. It is true that the tank. as it stood, untouched. was not a dangerous thing. but with the hoops removed, there being two feet of water in the bottom of the tank exerting pressure, the tank became an entirely different thing. The jury must have concluded that it was a dangerous thing, and this change from a safe thing to a dangerous thing. the jury must have concluded. was due to the negligence of the defendant company.

The next error complained of, and for which reversal is asked, was the refusal of the court to give requested instruction No. 9, which was as follows:

"You are instructed that there is no allegation in the petition by which the defendant is charged with negligence in directing or permitting to remain erected a wire fence so near said tank that when portions of the same started to fall the deceased was thereby prevented to escape from the parts thereof which were falling, and for that reason you are instructed that you cannot find the defendant guilty of negligence by reason of the position of the fence."

While we think that the court should have given this instruction, or one of similar im-

port, to limit and define to the jury the purpose of the admission of this evidence relative to this fence, yet we do not think the refusal to give same constituted reversible error. In narrating the facts and circumstances connected with and incident to this accident and how it happened. the evidence relative to the fence was unavoidable and competent as a part of the res gestae. and was competent for that reason and to throw light upon the specific charge of negligence. The evidence in the case shows that the deceased was working on the west side of the tank and when the tank started to collapse the deceased ran westward and into a four-wire fence ten or twelve feet west of the tank, and when he ran against the fence he turned up the fence. slipped and fell to his hands and knees, and it appears from the evidence that while in this position he was struck on the head with one of the pieces of timber, and when he was taken out from under the timbers, the evidence shows. he was close to or up against the fence. There is nothing in the evidence to show whose land the fence was on, by whom constructed. or when constructed, and there is no allegation in the petition relative to the fence. nor is its presence made a basis of negligence. The court admitted this evidence over the objection of the defendant company. The court should have limited and should have explained to the jury the purpose of the introduction of this evidence. The evidence relative to the fence was so clearly connected with the injury both in point of time and place that it was competent as bearing upon the main question of negligence. We cannot see that it constituted reversible error for the court to fail to limit the purpose of its introduction. Upon the question of the compentency of this proof, see subdivision "B", 26 Cyc. 1405, and notes.

In the case of Palmer Brick Co. v. Chenall (Ga.) 47 S. E. 329, we quote the following from page 331:

"While all the circumstances of the transaction under investigation which constitute the res gestae of the occurrence are admissible in evidence, and in this way evidence of acts of negligence not alleged may be received for consideration by the jury, still this is solely for the purpose of determining whether the specific acts of negligence alleged in the petition have been established. No matter how much evidence there may be of acts of negligence admitted under the operation of this rule, there can be no lawful recovery unless one or more of the specific acts of negligence set forth in the petition have been established to the satisfac-

tion of the jury. The other acts of negligence admitted as a part of the res gestae of the transaction may be looked to, to throw light on the question as to whether the specific acts of negligence relied on have been established; but, no matter how well established such other acts may be, the jury are not authorized to find in favor of the plaintiff unless at least one of the specific acts alleged has been proved to their satisfaction. Atlanta St. R. Co. v. Walker, 93 Ga. 462, 21 S. E. 48."

In the case of Kucera v. Merrill Lumber Co. (Wis.) 65 N. W. 374, the third paragraph of the syllabus reads as follows:

"In an action by an employe for personal injuries sustained while attempting to remedy a hot box at night, evidence as to the distance of the light, and that there was a shadow over the box, is admissible as part of the res gestae, and on the questions of the assumption of risk, and of defendant's negligence, though the complaint did not charge insufficiency of light."

The next error complained of as grounds for reversal is the refusal of the court to give special requested instruction No. 12, which was as follows:

"You are instructed that you cannot find the defendant guilty of negligence for a failure to furnish safe tools and appliances for the deceased to work, for the reason that there is no evidence which tends to establish that the hammer or chisel which were used by the deceased and his employes were in any way affected."

We hold that there was no error of the trial court in refusing to give said requested instruction No. 12, since we hold in this case that it was not necessary for the plaintiff to show a failure to furnish safe tools and appliances such as the hammer and chisel, as named in said requested instruction as the tools and appliances meant, since we hold primary negligence to be shown by ample and sufficient proofs upon other grounds.

The next error assigned is the refusal to give requested instruction No. 13, which reads as follows:

"You are instructed that the work in which the deceased and the members of his crew were engaged, was tearing down the water tank and that as the same was torn down, the situation and the condition surrounding the deceased and the other members of the crew were constantly changing, and that the defendant in this case is not liable for any dangers created by any of the members of the crew in tearing down the tank which arose from and were created by their acts in tearing down said tank."

Under the holdings made in this case, this instruction has no application, and there was no error in refusing same.

The judgment of the trial court is affirmed.

PITCHFORD, V. C. J., and JOHNSON, McNEILL, and KENNAMER, JJ., concur.