## NEW et al., Receivers, v. M5MILLAN, Adm'x, et al.

No. 10071—Opinion Filed May 25, 1920.

Rehearing Denied July 20, 1920.

(Syllabus by the Court.)

1. **Master and Servant—Action for Death of Railroad Employe—Instructions.**

Instructions examined and found to contain no substantial error, either in the instructions given or in the refusal of instructions offered by plaintiffs in error.

2. **Same—Evidence—Sufficiency.**

(a) The record of testimony examined and found to be sufficient to sustain the finding of the jury that deceased at the time of his death was in the employ of the railroad company.

(b) That it is sufficient to warrant the finding that the deceased came to his death through the negligence of the railroad company.

(c) Under all the evidence it is sufficient to sustain the verdict as modified.

3. **Master and Servant—Proof of Relation.**

Whether or not the relation of master and servant exists in a given case is a question of fact or of mixed law and fact, and is to be proved as any other like question.

4. **Same—Contractual Relation.**

The relation of master and servant arises only out of contract; to constitute such contract there must be mutual understanding; a mutual agreement between and a mutual meeting of the minds of the parties.

5. **Same—Termination of Employment.**

Where it is agreed that the relation of master and servant had existed up to a given time, but an issue as to whether such relation ceased at such time and was transferred to a third person, a reasonable test in such case is whether or not the servant by mutual agreement terminated his employment, ceased to be under the control and orders of the former master, renounced obedience to such master, and knowingly and willingly subjected himself to the orders of another under a new agreement with a new master.

6. **Same—Working With Third Person—Effect.**

Where a servant is under the control and subject to the orders of the master and under his employ, owes obedience to such master, and is ordered by such master to assist a third person to do a piece of work, and while so doing he remains under the control and subject to the orders of his master, he does not in such case become the servant of such third person, but remains the servant of his master.

7. **Same—Negligent Death of Employe—Liability of Master.**

Where a master orders his servant to assist a third person in doing a hazardous piece of work without warning him of the dangers thereof, the servant being unacquainted with the dangers of such work, and being under the control and subject to recall from same while engaged in such work, and while so engaged he loses his life through negligence in the operation of machinery, the master is liable in damages for such injury.

8. **Same—Duties of Master—Negligence.**

It is the duty of the master to exercise reasonable care in providing for his servants a safe place in which to work, reasonably safe tools and appliances with which to work, reasonably careful, prudent, and competent fellow servants with whom to work, and to warn them of dangers incident to a new piece of work with which they are unacquainted, and where a failure to discharge any one of such duties constitutes the proximate cause of an injury, the master will be held liable for damages.

9. **Death — Wrongful Death — Action by Widow and Children—Elements of Damages.**

In an action by a widow and minor children for the death of the husband and father caused by the wrongful act of another, the law does not undertake to condole with them on the loss of the husband and father, but merely provides for such damages as will reasonably compensate the family for the pecuniary loss sustained.

10. **Appeal and Error—Reduction of Judgment—Excessive Verdict.**

Where a verdict for damages is so far beyond the compensation contemplated and provided for by law as to plainly indicate that the jury was actuated by bias, prejudice, or passion, the verdict will be reduced for excessiveness.

Error from District Court, Pontotoc County; J. W. Bolen, Judge.

Action by Effie McMillan and minor children against Alexander New and another, receivers of the Missouri, Oklahoma & Gulf Railway Company, for damages for wrongful death of Ben McMillan. Judgment for plaintiffs, and defendants bring error. Modified and affirmed.

Arthur Miller and Jones & Foster, for plaintiffs in error.

S. P. Jones and E. N. Jones, for defendants in error.

HARRISON, J. This suit was begun by Effie McMillan, as administratrix of the estate of her deceased husband, Ben McMillan, and for herself and five minor children asking judgment against the Missouri, Oklahoma & Gulf Railway Company and its receivers for negligently causing the death of her husband, while engaged in unfastening an elevator bucket at the top of a coal chute.

The cause was tried upon the issues, first, whether the deceased, if found to be in the employment of defendants, came to his death by his own contributory negligence; second, whether he was in the employ of defendants or that of Arnold & Co., independent contractors, who were constructing the coal chute for the railway company.

The verdict of the jury was in favor of plaintiffs, against the railway company, for the sum of $21,780. From the judgment upon such verdict, the railway company appealed.

The assignment of errors contains 15 separate grounds for reversal. These may all be embodied in and disposed of under the following heads, to wit:

(1) Whether the court erred in instructing the jury.

(2) Whether the evidence supported the verdict of the jury.

(3) Whether the court erred by entering a judgment not in accord with the verdict.

(4) Whether the verdict was excessive.

On the first question, we have examined the court's instructions, as well as those offered by the defendants and rejected by the court, and are of the opinion that the court's instructions upon the theory upon which the cause was tried were a fair and substantially correct statement of the law applicable to the facts in the case.

The cause was tried upon the theory that the railroad company was engaged in interstate commerce, and that if the deceased was in the employ of the railroad company and came to his death by the negligence of the railroad company, the damages, if any, should be awarded under the federal Employers' Liability Act.

As to whether the work in which the deceased was engaged did in fact constitute interstate commerce, thereby bringing him within the federal Employers' Liability Act, we are not called upon to decide, as that question is not made an issue here, nor was it made an issue in or decided by the trial court.

The cause seems to have been tried by mutual consent, upon the theory that if the railroad company was liable at all, it was liable as an interstate carrier.

The court instructed the jury as to the law applicable in such case, and we find no substantial error in the instructions given, nor in the refusal of the instructions offered by the railroad company.

As to the sufficiency of the evidence, three questions are to be determined:

(1) Whether the evidence was sufficient to warrant the jury in finding that the deceased was in the employ of the railroad company, and not in that of the independent contractor.

(2) Whether there was sufficient evidence to warrant the finding that deceased came to his death by the negligence of the railroad company, or whether by his own contributory negligence.

(3) Whether under all the evidence it is sufficient to sustain the verdict as modified.

On each of these questions the testimony was in direct conflict.

It is undisputed, however, that deceased was in the employment of the railroad company, and under its direction and control up to the very minute that he began work on the coal chute.

M. P. Nash, the round-house foreman, denied that he had ordered or directed the deceased to go up on the coal chute, though he admitted that deceased was under his orders and control in and around the round-house and that he would have been discharged for any disobedience of his orders. He testified that Mr. Korten, the man who had had charge of the construction of the coal chute for the construction company, called to him, Nash, and asked him to send up a man to help dislodge the bucket at the top of the coal chute; that he told Joe McMillan, a brother of the deceased, to go up on the coal chute and help Joe Korten, the Arnold man, and repeated that he told Joe McMillan to help Joe Korten with the bucket, but did not tell Ben McMillan, the deceased, to go.

Joe Korten testified that the deceased went up on the coal chute of his own accord, though he admitted that he asked Nash to send up a man to help him, and testified that Joe McMillan was the man who came in obedience to Nash's orders; but Joe McMillan testified that Mr. Nash told him to go up and help Ben, the deceased, with the bucket, and Ed Davis testified that he heard Mr. Nash tell Ben to go up. Here was a direct conflict in testimony; Nash and Korten testifying that Nash did not order the deceased to go up, and Joe McMillan and Ed Davis testifying that Nash did order deceased to go up.

The jury was the exclusive judge of the credibility of these witnesses, and gave credence to the testimony of Joe McMillan and Ed Davis, and under the law the jurors being the exclusive judges of the credibility of the witnesses and the weight to be given their testimony, this court cannot say that they erred. And, if Joe McMillan and Ed Davis told the truth, then Ben McMillan, the deceased, was ordered by Nash to go up on the chute and help Korten. This being true, he went up there in obedience to the command and orders of the railroad company, through its round-house foreman, and in fulfillment of his obligations under his employment to obey the orders of such foreman; therefore he was in the employment of the railroad company, notwithstanding the fact that the coal chute had been constructed under an independent contract. The construction company, nor Joe Korten, the representative of such company, had any authority to command Ben McMillan or Joe McMillan, nor did either presume or exercise such authority. It had completed its independent contract and its men had quit work some time before, and Joe Korten had been recalled by the railroad company to repair a defect in the working of the coal bucket in which the coal was carried up through an open steel frame elevator and dumped into the coal chute. Under his testimony, and also the testimony of Mr. Nash, the round-house foreman, Korten did not assume to direct the round-house employes to help him, but, recognizing Nash's authority to do so, called upon Nash to send help, and Nash said he sent the help in response to Korten's request for it. Nash also testified that he required strict obedience to his orders and would fire an employe who refused to obey.

The circumstances were that a concrete coal house had been constructed upon trestles high enough above the ground that cars could pass under the coal house and load with coal. On the south side of the coal house the Arnold Construction Com-

pany had constructed a steel shaft or tower, operated by electricity, by means of which coal was elevated from the coal pit on the ground to the top of the coal chute, which ran at an angle of 45 degrees from the elevator shaft, down into the top of the coal house. The elevator shaft extended high enough above the top of the coal house that when the coal bucket dumped, the coal was discharged in the top of the chute, extending from the elevator shaft into the top of the coal house. The defect requiring repair was that the bucket did not dump and return automatically, as it was intended to do, but when it reached the top of the shaft it would hang and would not come down again. This shaft, together with the machinery and appliances necessary for its operation, had been completed and turned over to the railroad company, and Mr. Korten and his employes had left, he having gone to his home in Denison, Texas.

There was an effort on the part of Mr. Korten to show that this elevator had been operated without authority, and to saddle such operation upon Ben McMillan, the deceased. There was also some disposition on the part of the railroad company to deny that it had operated the elevator, but whatever their contentions in that regard may have been, the facts were that the elevator had been completed and turned over to the railroad company and coal had been elevated up through the shaft and dumped into the coal chute extending from the shaft into the top of the coal house, and in thus operating the mechinery of the elevator, the bucket, which held about a ton and a quarter of coal, had dumped the coal into the chute, but had turned upside down and become fastened and failed to return to the bottom.

Now the jury was at liberty to conclude that the railroad company had been operating the elevator, else the bucket would not have been hung at the top, and the railroad company would not have known that it did not work with the automatic perfection it was intended to work, and therefore at liberty to disregard the testimony of Korten, which tended to show that Ben McMillan had been operating it without authority, as well as the testimony of Nash that it had not been operated at all.

The testimony was that Ben McMillan was without education, had nothing to do with the operation of the machinery, but was an ordinary manual laborer, who, under the direction of his foreman, Mr. Nash, worked in and around the fire pit, and there was no

testimony that he ever attempted to operate any of the machinery or to assist in the operation of same. Hence the finding of the jury that the deceased went to this work in obedience to the commands of his foreman was supported by the positive testimony of two witnesses, whose testimony, if true, was sufficient to sustain such finding, and the jury was at liberty and it was their exclusive province to decide whether or not these two witnesses, Joe McMillan and Ed Davis, told the truth.

Likewise the finding that deceased at the time of his death was in the employ and working under the orders and directions of his foreman, was sustained by the evidence and is supported by the law.

This was only a 10 or 15 minute job. Korten had no authority to command Joe and Ben McMillan to do anything, and plainly recognized such fact. Nor would Joe and Ben McMillan have been under any obligations to obey Korten's orders. They could not have done so without disobedience to Nash. Nor could Nash terminate their obedience to him and transfer same to Korten except by a full agreement and understanding on their part and consent on their part to terminate obedience to Nash and acknowledge obedience to Korten. Such a condition is not apparent from the record.

For, if the testimony of Joe McMillan and Ed Davis was true, then Ben McMillan went to this work in obedience to the commands of the railroad company, speaking through its foreman, Mr. Nash, and the relation of master and servant between the railroad company and the deceased had not terminated.

"Whether or not the relation of master and servant exists in the given cases is a question of fact, or of mixed law and fact, and is to be proved as any other like question." 26 Cyc. 971.

"The relation of master and servant arises only out of contract." 26 Cyc. 968.

To constitute such contract there must be a mutual understanding, a mutual agreement between and mutual meeting of the minds of the parties.

"Like every other contract the relation of master and servant is the product of a meeting of minds. There must be an offer on the part of one and an acceptance on the part of the other. No person can be subjected against his will to the full measure of the obligations that the law has attached to the contract of service." 18 R. C. L., page 493, sec. 3, citing W. U. T. Co. v. Northcutt (Ala.) 48 South. 53; Macclay v. Harvey, 90 Ill. 525; Fitzpatrick Ginning Co. v. Mc-

Laney (Ala.) 44 South. 1023; Atlantic R. Co. v. West, 121 Ga. 641, 67 L. R. A. 701.

To the same effect is the text in Labatt's Master & Servant, vol. 1, 2nd Ed., beginning on page 98.

In cases like the one at bar, where it is agreed that the relation of master and servant had existed, but where there is an issue as to whether such relation had ceased and been transferred to a third person, a reasonable test and it seems to us the real test in such case is whether or not the servant by mutual agreement terminated his employment, ceased to be under the control and subject to the orders of the former master, renounced further obedience to such master, and knowingly and willingly subjected himself to the orders of another, under a new contract with a new master. Likewise the test as to a third person's liability for injuries caused by the acts of such servant depends upon whether the master has relinquished all control over the servant, or still retains a general contract over him, and where only partial contract is exercised by such third person he cannot be held liable for the acts of such servant. See 26 Cyc. 1522-3.

There was no evidence to the jury that Nash's authority over Joe McMillan, the surviving brother, ever ceased, or was in any wise or for any period of time relinquished, further than as to the mere details as to how to do the work, which the master, Nash, had ordered him to do. Joe McMillan was ordered by Nash to go help Korten on the tower; Korten exercised no further control over him than merely to tell him how to do the work, and after the work was done, Joe McMillan continued in obedience to and subject to orders and control of Mr. Nash. It was never intimated to him by Nash that the relation between them had ceased or terminated and that he would thereafter be subject to the orders of Korten under a new contract with Korten, nor is there any intimation that Korten and Joe McMillan entered into any agreement out of which the relation of master and servant could arise. It was merely the granting of a favor to Korten in the granting of which both Korten and the railway company were to be benefited.

Now, if Joe McMillan and Ed Davis told the truth, the identical condition or relation existed between Ben McMillan, the deceased, and the railroad company that existed between Joe McMillan, the surviving brother, and the railroad company.

The transaction at the utmost amounted to no more than a mere temporary lending for a few minutes, by the master, Nash, of

his servants, Ben and Joe McMillan, to a third person, either or both of whom were subject to recall by Nash at any moment he saw fit.

"It is well settled that one who is a general servant of another may be loaned or hired by his master to another for some special service, so as to become as to this service the servant of such third person, the test being whether in the particular service which he is engaged to perform he continues liable to the direction and control of his master or becomes subject to that of the person to whom he is loaned or hired. It makes no difference whether the proprietor to whom a servant is loaned actually exercises his right of control or direction as to the details of the work or simply sets the servant to do what is necessary, trusting to his expert skill for the results." 18 R. C. L., page 493-4, sec. 3.—citing Wyman v. Berry (Me.) 75 Atl. 123; Sacker v. Waddell (Md.) 56 Atl. 399; Hasty v. Sears (Mass.) 31 N. E. 759; Gagnon v. Dana (N. H.) 39 Atl. 982, 41 L. R. A. 389; Wilson v. Valley Imp. Co. (W. Va.) 73 S. E. 64, 45 L. R. A. (N. S.) 271; and Patterson v. Canadian Pac. R. Co., 26 Ont. L. Rep. 410; Delory v. Blodgett (Mass.) 69 N. E. 1078, 64 L. R. A. 114.

Some features of the doctrine announced in the foregoing text are reflected in each of the above cited cases. Also 26 Cyc. 1087; Mo., etc., R. Co. v. Finch (Tex.) 44 S. W. 317; Goodwin v. Smith (Ky.) 66 S. W. 179, holding that the liability of the master does not cease unless the servant has been informed of the change and has willingly accepted same.

Hence under the facts, which the jury within its exclusive province found to be true, and under the decisions applicable to such state of facts, the deceased was a servant of the railway company at the time he met his death.

As to the question of contributory negligence and assumption of risk, these questions were fairly and correctly submitted as questions of fact to be found by the jury. There was conflict in the testimony as to whether defendants or Korten were guilty of negligence, and also conflict as to whether deceased by his own negligence contributed to the cause of his death, and upon such conflicting testimony the jury found for the plaintiffs.

The railroad company claimed that deceased did not go to his work under its orders, but went either voluntarily or under the orders of Korten; Korten denied having ordered him, but stated that he went voluntarily; however, there was no testimony as to whether Korten had opportunity to know whether Nash had ordered deceased to go to the work or not, hence Nash was

not corroborated, and there was the positive testimony of Joe McMillan and Ed Davis, as before stated, that Nash had ordered Joe to go upon the tower and help dislodge the bucket.

Joe McMillan testified that after he and his brother, the deceased, had climbed to the top of the tower, they debated as to how they would go to work to unfasten the bucket, and finally concluded that he would go into the shive house, a house erected on top of the frame tower, and stand on the south side on a little platform between the elevator shaft and the walls of the shive house, while his brother would slip around to the north side and hang over into the chute while he worked from that side. There was not room on the north side of the shive house between the wall and the elevator shaft for him to stand and work, so in order to get at the work he was compelled to climb around the shaft and hang his feet and body down the coal chute, holding with one hand while he wrenched at the bucket with the other. Likewise Joe was compelled to stand on the platform south of the shaft and hold to the framework with one hand while he worked at the bucket with the other. That in a few minutes, or about the time they both took hold of the bucket, the electric current was turned on from the bottom without any knowledge of theirs or warning to them, which caused the bucket to suddenly jerk upward, throwing them both loose; that it gave him a severe shock and threw him back against the wall; that after the sudden jerking of the bucket which threw them loose, he stood for some minutes without doing anything; that it had not occurred to him at that time that his brother had been killed, but he stood there thinking that possibly his brother had caught and saved himself the same as he had and would climb back and show himself in a short time; that while he was standing there a man by the name of Williams climbed up to the top of the tower and asked him what had become of the other man (Williams, it seems, had gone to the top of the tower in response to a request of Korten); that not seeing deceased, Williams suggested that he was a goner, and they went down the shaft to a place where they could look through a crack into the coal house and there they saw the deceased, crushed and mangled from the fall of about 40 or 45 feet.

Under this testimony and the attendant circumstances the jury is sustained in finding the railroad company guilty of negligence in the following particulars:

First. In failing to provide a reasonably safe and suitable platform on each side of

the elevator shaft and on the inside of the shive house for employes to stand upon in adjusting the bucket or other machinery which required attention at that point.

2nd. In failing to instruct them of the dangers incident to the work which they were ordered to do, they both being unskilled laborers, neither of whom knew anythng about machinery or electric appliances or the dangers incident to the operation of same.

3rd. In failing to furnish reasonably careful, prudent, and competent fellow servants with whom to work.

These are duties which the master owes to his servant, duties which the law required to be discharged, and where by the failure to discharge any one of such duties the servant is injured, the master may be held liable therefor in damages. Ardmore Oil Co. v. Barner, 72 Oklahoma, 179 Pac. 932; Dickinson v. Whitaker, 75 Okla. 243, 182 Pac. 901; Davis v. Ball, 76 Okla. 252, 185 Pac. 105; Ft. S. & W. R. Co. v. Knott, 60 Okla. 175, 159 Pac. 847; C., R. I. & P. R. Co. v. Devore, 43 Okla. 534, 143 Pac. 864-5; C., R. I. & P. R. Co. v. Brazzell, 40 Okla. 460, 138 Pac. 794.

The jury made no special finding as to what specific act of negligence upon which the railroad company was found liable, but returned a general verdict in favor of plaintiffs for a specific sum. That the railroad company had failed to discharge all of the above duties was an issue in the case. The testmony as to all of such duties was conflicting, yet from an examination of the entire record we must conclude that the evidence was sufficient to sustain the jury in finding the railroad company liable. As to whether the court rendered a judgment not in accord with the verdict of the jury and thereby committed error, it is argued at considerable length by plaintiffs in error in their briefs that the judgment of the court was not in accord with the verdict of the jury and that the court erred in rendering such judgment and they have cited a number of authorities in support of their contention.

The verdict of the jury was as follows:

"We, the jury, impaneled and sworn in the above entitled cause, do upon our oaths find for the plaintiffs and assess their damages at $21,780, twenty-one thousand seven hundred and eighty dollars. And apportion it among them as follows:

To Effie McMillan _____ $9,000 Dollars
　Ben J. McMillan _____ 1,000 Dollars
　Joseph McMillan _____ 1,780 Dollars
　Lucile McMillan _____ 2,500 Dollars

Rosella McMillan _____ 3,500 Dollars
Ozetta McMillan _____ 4,000 Dollars
　　　　　　　　　　　　————
　　Total _____$21,780

J. H. Lovelady, Foreman."

The judgment as amended by the court is as follows:

"It is therefore ordered, adjudged and decreed by the court that the said plaintiffs, Effie McMillan, administratrx, for the use and benefit of Effie McMillan, Ben J. McMillan, Joseph McMillan, Lucile McMillan, Rosella McMillan and Ozetta McMillan, have and recover of and from said defendants, Henry C. Ferris and Alexander New, receivers for the Missouri, Oklahoma & Gulf Railway Company, a corporation, twenty-one thousand, seven hundred and eighty dollars ($21,780), apportioned as follows, to wit:

"Effie McMillan, nine thousand ($9,000) dollars;

"Ben J. McMillan, one thousand ($1,000) dollars;

"Joseph McMillan, one thousand seven hundred eighty ($1,780) dollars;

"Lucille McMillan, twenty-five hundred ($2,500) dollars;

"Rosella McMillan, thirty five hundred ($3,500) dollars;

"Ozetta McMillan, four thousand ($4,000) dollars.

"Together with the costs of this case for which let execution issue."

Now, it must be observed that the plaintiffs, in the amended petition, the petition which presented the issues for trial in the court below, were Effie McMillan, the administratrix of the estate of Ben McMillan, deceased, and Effie McMillan for herself and her five minor children, naming them; it is observed also that the jury found for the plaintiffs in the sum of $21,780, but apportioned such sum among the plaintiffs as stated in the verdict.

Now, the judgment of the court was no more nor less than a judgment in favor of plaintiffs, apportioned exactly as the jury had apportioned it. Therefore we must conclude that the judgment of the court was not in conflict with the verdict of the jury and that the decisions relied upon by plaintiffs in error are not in point.

On the issue as to whether the verdict is excessive, it is contended by plaintiffs in error that the verdict is grossly excessive, citing decisions of this court and from other courts where verdicts have been reduced, in support of such contention.

On the other hand, it is urgently insisted by defendants in error that the verdict is

not excessive, citing a great number of well-reasoned cases, wherein verdicts varying from $18,000 to $40,000 have been sustained.

But in cases of this character there is no fixed and definite rule, nor can there be made a rule by which exactly correct compensation with absolute justice may be measured in all cases. No fixed rule could possibly give exactly correct compensation with absolute justice in all cases, hence the decisions of other courts in other jurisdictions, or this court in other cases, although in a general way based upon a somewhat similar state of facts, do not become binding precedents in all cases, but, while they may be of great assistance and become mutually beneficial, they are at best no more than persuasive.

Neither the decision in Brickman v. Southern R. Co. (S. C.) 64 S. E. 553, cited by defendants in error as sustaining a verdict for $40,000 as not excessive, nor the decision of this court in Independent Cotton Oil Co. v. Beacham, 31 Okla. 384, 120 Pac. 967, cited by plaintiffs in error as reducing a verdict for $25,000 as being excessive, is binding in the case at bar, although the reasoning in each of said decisions has been of great assistance herein. We readily concede the correctness of each of said decisions; they were based upon different facts and surrounded by different circumstances, in neither case identical with the case at bar; therefore this court is not bound, nor could it be bound, by either of said decisions.

Every case of this character must be decided under the light of past human experience and wisdom, and in view of all the particular facts and circumstances surrounding it and the peculiar conditions arisng from or created by it. The deceased in the case at bar was a man 33 to 37 years of age; the record is not clear on this point, but he was uneducated, unskilled, and not qualified for any other work than simple manual labor. He was engaged in working around the fire pit and in cleaning out the fire pit, earning $55 per month, or $660 per year. The verdict for $21,780 at 10 per cent. per annum would bring an annual income more than three times as great as what he could earn, and about twice as great at 6 per cent. per annum, and more than two and one-half times as great at 8 per cent. So, eliminating all possibilities of sickness and other disabilities, and all tables of life expectancy, the verdict at the medium rate of interest would bring an income more than two and one-half times as great as his labor.

The act under which this case was tried, the federal Employers' Liability Act, provides that a carrier shall be liable in damage to the person sustaining an injury, or, in case of death, to the personal representative of deceased, for the benefit of survivor and children, but does not fix or undertake to graduate the amount of damages recoverable.

Section 2045, Rev. Laws 1910, provides that any person who suffers detriment from an unlawful act or omission of another may recover from the person in fault a compensation therefor in money which is called damages. It will be observed that the damages provided for in the above statute, the damages contemplated by such statute, are such as will compensate in money: that is, such as will compensate for the money loss sustained, the pecuniary injury sustained. The law does not undertake to heal the wounds of grief nor to supply the counsels and comfort of a husband and father, and very wisely refrains from such undertaking. To attempt to do so would be futile and impossible, as well as unsafe.

This provision of law may seem cold and sordid, and in many cases may be so, but, on the other hand, the lawmakers and the courts have realized that to undertake with money to fill the place which a father and husband has filled in his family is just as sordid and that to undertake to do so by law would be to open up avenues more dangerous to justice than merely to prescribe a compensation for the pecuniary injuries sustained.

It seems to us, in view of the entire record and in consideration of the surrounding conditions and circumstances that a judgment for two-thirds of the amount of the verdict; that is, a judgment for $14,520 and costs, would fully and fairly meet the compensation contemplated and provided for by law.

With this modification of the judgment and with instructions that plaintiffs file a remittitur of all in excess of $14,520, and that said sum of $14,520 be apportioned to plaintiffs in the same ratio as the verdict, the judgment is affirmed.

RAINEY, C. J., and JOHNSON, HIGGINS, RAMSEY, McNEILL, and BAILEY, JJ., concur.