MAMIE SIMPSON, Administratrix of G. T. SIMPSON, v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Appellant.—70 S. W. (2d) 904.

Division One, April 19, 1934.

*E. T. Miller* and *Mann, Mann & Miller* for appellant.

*Commons & Chandler, Frank Nesbitt* and *A. R. Dunn* for respondent.

STURGIS, C.—The plaintiff, as administratrix of her deceased husband, brought this suit and recovered judgment for damages for the wrongful death of her husband, G. T. Simpson, caused by the alleged negligence of defendant in the operation of one of its trains. The plaintiff's said husband was killed at a grade crossing in the city of Muskogee, Oklahoma, where an automobile driven by deceased, in attempting to cross defendant's railroad track, was struck by one of defendant's trains, resulting in his instant death. The deceased's home was in Kansas, where his widow, the plaintiff,

became administratrix of his estate and brought this suit in Newton County, Missouri. The cause of action arose in Oklahoma and defendant concedes that plaintiff has a right to bring and maintain this action under the Constitution and laws of Oklahoma, the suit being for the benefit of plaintiff as widow and for her and his minor children named in the petition. The defendant appeared and went to trial, resulting in judgment against it for $10,000, to reverse which this appeal is prosecuted.

The undisputed facts are that at the time plaintiff's husband met his death he was traveling in an automobile west on Gibson Street, a much used public street and highway in Muskogee, which is crossed at a grade by defendant's line of railway at nearly right angles, the tract running somewhat east of north. The train in question was going north or northeast and collided with the automobile near the north curb of Gibson Street at about seven-thirty o'clock on the morning of June 1, 1928.

It is conceded that the substantive laws of Oklahoma, where the deceased met his death, relative to the operation of railroad trains in that state are, where relevant, applicable to and govern this action, and both plaintiff and defendant invoke by their pleadings several statutes of that state, as well as court decisions of that state interpreting same, which need not be set forth here in detail. The action is based on defendant's negligence in the operation of the engine and train which collided with and killed the deceased, and it will suffice to say that the trial court submitted the case to the jury on two grounds of negligence alleged in the petition, to-wit, (1) that the defendant and its employees operating the train failed to sound the whistle or bell on said locomotive engine on approaching the crossing of Gibson Street, as required by the laws of Oklahoma; (2) that such train was being operated and run in the city of Muskogee at a speed and under circumstances that was too great and dangerous to persons in the lawful use of said street. Other acts of negligence were pleaded as giving a cause of action, such as failure to keep in repair and operating a crossing bell located there to warn travelers of the approach of trains, failure to keep a watchman at such crossing for the same purpose, and failure of the trainmen to keep a proper lookout and watch for persons using this crossing, in view of the fact that the street was a U. S. and State highway over which there was almost constant travel; but under the instructions of the court plaintiff was not allowed to recover on such grounds, though much of the evidence relating to same had a bearing on the question of deceased's contributory negligence. As supporting and making more definite the ground of negligence in failing to ring the bell or sound the whistle on approaching this crossing, the plaintiff pleaded and put in evidence the statutory provisions of Oklahoma providing that ''any person in charge as engineer of a locomotive

engine, who omits to cause a bell to ring or a steam whistle to sound at the distance of at least eighty rods from the place where the track crosses, on the same level, any traveled public way," is punishable by fine or imprisonment; and a statute requiring engines to carry a bell or steam whistle, which "shall be rung or whistled at the distance of at least eighty rods from the place where the said railroad shall cross any other road or street," under penalty of a fine, "and shall also be liable for all damages which shall be sustained by any person by reason of such neglect;" and also a statute requiring all railroads to construct and maintain all railroad crossings "unobstructed, in a good condition for the use of the public." As supporting and making more definite the ground of negligence that defendant was operating the train in question at an excessive and dangerous rate of speed, the petition alleged that when he was driving his automobile over defendant's track at the crossing in question, "a train owned and operated by defendant, traveling on its track toward the north, at a high and dangerous rate of speed of from thirty to thirty-five miles per hour, struck plaintiff's deceased and the car in which he was riding, with such force and violence that the said G. T. Simpson was killed almost instantly and his car was demolished; that at the time said decedent was killed by defendant's train in the manner aforesaid, there was in effect in the city of Muskogee, Muskogee County, Oklahoma, City Ordinance No. 1351, which makes it unlawful for any railway train to be operated in the district in which said accident occurred at a greater rate of speed than twelve miles per hour." The plaintiff also pleaded and put in evidence a section of the Constitution of Oklahoma, which reads: "Section 6. The defense of contributory negligence or of assumption of risks shall, in all cases whatsover, be a question of fact, and shall, at all times be left to the jury."

The defendant, after moving unsuccessfully to strike out the section of the Oklahoma Constitution just quoted and all allegations of the petition relative to same as not being in accordance with the laws of this State and not binding on the courts of this State in the trial of cases like this, as such provision relates to procedure only, set up and invoked the statute law of Oklahoma making it unlawful for anyone to drive any motor vehicle over the track of a railroad "without first coming to a complete stop," such law not to apply, however, in any city having ordinances regulating the traveling of motor vehicles in such city. The defendant pleaded contributory negligence of the deceased in violating the law just mentioned in that deceased on approaching the crossing in question "drove said automobile at a high, excessive and dangerous rate of speed; that he did not stop said automobile or cause the same to be stopped before attempting to cross defendant's track, as required by the law of Oklahoma; that defendant does not know whether the said G. T. Simp-

son looked or listened for an approaching train as he approached defendant's track, but alleges the fact to be that he either did not look or did not listen for approaching trains, or if he did look or listen, he failed to heed what he saw, or heard, or by the exercise of ordinary care could have seen or heard, and as a direct result thereof drove said automobile upon the defendant's track immediately in front of an approaching train and came in collision therewith.''

The defendant also set up at much length the invalidity of the city ordinance of Muskogee limiting the running of trains through the city and over its street crossings to not exceed twelve miles per hour, as being in violation of defendant's rights as a common and interstate carrier of passengers and freight engaged in interstate commerce, and the carrying of United States mail; also that such ordinance was and is void in that it is unfair and discriminatory as against defendant in not applying to other carriers of freight and passengers, such as motor busses, with which defendant must compete, and that ''by reason of the facts herein set forth, said ordinance, in respect to the provisions above mentioned, is unreasonable, oppressive, arbitrary, discriminatory and unlawful and constitutes an interference with and an undue burden upon interstate commerce and is, therefore, void, and if violated by defendant's train in question, which defendant denies, it constitutes no act of negligence on the part of defendant in this case.'' The court ruled against defendant on this contention and defendant does not stress the point here.

At the trial plaintiff made a case for the jury on the two grounds of negligence on which the case was submitted to the jury. There was ample evidence warranting a finding that defendant's train was being run at twenty-five to thirty miles per hour as it approached and passed over this crossing where the city ordinance limited the speed at not to exceed twelve miles per hour. The jury was also justified in finding defendant guilty of common-law negligence in operating this train at such a high rate of speed over this much used highway, obstructed, as it was, from the view of travelers thereon. The evidence was ample to warrant the finding that defendant's trainmen did not either ring the engine bell or sound the whistle on approaching this crossing, as required by the law of Oklahoma. The defendant admits that witnesses who were in a position to hear testified that the train neither sounded the bell nor whistled as it approached this crossing till it was right at and entering on the street crossing, when the engineer saw the deceased's automobile going onto the track and gave a sharp emergency whistle, too late to prevent the accident.

The crucial point in the case is plaintiff's contributory negligence. The defendant insists that its demurrer to the evidence should have been sustained on the ground that the evidence, even

when taken most favorable to plaintiff, conclusively shows that deceased was negligent as a matter of law in driving his automobile onto this track immediately in front of a coming train, which could and should have been seen by the deceased in time for him to have stopped in safety. Defendant insists that this was purely a question of law for the court and that the case should have been taken from the jury, notwithstanding the Constitution of Oklahoma provides that the question of contributory negligence, which in that State, as well as in this State, bars any recovery notwithstanding defendant's negligence. shall in all cases be a question for the jury. Defendant's position is that this provision of the Oklahoma law is one of procedure only and merely fixes the method of trial of such issue, and, while binding on the courts of that state, is not binding on the courts of another state, even in trying a case originating in that state, questions of procedure being determined by the law of the forum.

Such question, however, does not arise in this case unless the evidence was such that the trial court was, under the law of this State, compelled to declare that the deceased was, as a matter of law, guilty of contributory negligence. The trial court submitted to the jury the question of the deceased's contributory negligence, and if the evidence is such as to make that a jury question, then the action of the trial court must be upheld under the law of this State, as well as of Oklahoma. If the trial court is justified by the facts in submitting deceased's contributory negligence to the jury, then the court's views as to his duty under the law of Oklahoma is not material.

What, therefore, are the facts bearing on deceased's contributory negligence? The deceased was traveling west toward the crossing on the north side of Gibson Street and the train was approaching from the south. It is shown that this street was so built up with houses along its south side that the deceased could not, because of the obstructions, see the approaching train till he passed the last house, a brick store building, next to the right of way and estimated at thirty-five feet from the track. The view to the south was then unobstructed, but it is apparent that the front end of the automobile would be at least five or six feet nearer the track when the driver could see past this building. The companion of the deceased, riding at his side, and who was injured but not killed in the collision, testified that deceased, as well as himself, commenced looking and listening for a possible train some one hundred fifty feet from the crossing but did not and could not see or hear any train, though the bell or whistle, if sounded, could have easily been heard. A crossing bell was located a few feet from the track on the north side of the street and the evidence shows that this was not ringing. The only point as to this is that there was no warning whatever of this train's approach being sounded, according to plaintiff's evidence. The de-

ceased's automobile was traveling about fifteen miles per hour and he slowed down somewhat to about twelve miles per hour, and when the locomotive engine at the south curb of the street, as the engineer says, gave the sharp warning signal, the deceased put the brake on harder and swerved his car to the right or north and the engine struck, or "sideswiped" it, as one of the witnesses said, just as it turned north up the track. The engineer and one or two other witnesses for defendant said that the automobile turned north several feet before reaching the track, passed over the north curb of the street and went some fifteen to twenty feet on the right of way just east of the track and then turned over in the ditch onto the track before the engine struck it. This point was sharply contested, but we do not see that it throws much light on the question of deceased's contributory negligence. The train was a light one, consisting of the engine, tender and two coaches, and it carried the automobile some eighty to ninety feet from the center of the street, where the engineer first applied his brakes, and then came to a stop.

With these facts in mind, we will examine the defendant's contention that it was the imperative duty of the deceased in approaching this crossing, the railroad track itself being a signal of danger, to look down the track to the south as soon as he could see in that direction on passing the obstructing building, and had he done so he would have seen the coming train while he was some thirty feet from the track, giving both space and time in which to stop in safety. The evidence is that the automobile could have been stopped in about ten feet in an emergency. From this it is argued that either the deceased did not look and give heed to what he saw at his first opportunity to do so, or that he was traveling at such speed and with his car in so little control (the brakes were in good condition) as to speak negligence in that respect. As supporting its contention that deceased was negligent as a matter of law under these facts, defendant cites and relies on several Missouri cases.

In Monroe v. Chicago & A. Railroad Co., 297 Mo. 633, 249 S. W. 644, it is held that notwithstanding the failure of the train to give the statutory signals on approaching a public crossing and that the train was running at a speed prohibited by ordinance, yet it was the duty of a traveler on the highway to look for a coming train after passing obstructions to his vision, if he could do so while yet in a place of safety and before attempting to cross the track, and if by so doing he could see the train in time to stop before entering on the track, his failure to do so is negligence as a matter of law. [See, also, Hayden v. Railroad, 124 Mo. 566, 28 S. W. 74; and Kelsay v. Railroad, 129 Mo. 362, 30 S. W. 339.]

In Evans v. Railroad, 289 Mo. 493, 233 S. W. 397, it is held that a distance of fifteen feet between the point of the first clear vision and the west track, under the circumstances of that case, was suf-

ficient to show negligence as a matter of law. The court said: "The top of the automobile was up, but the side curtains were not on, and there was nothing in the car itself to obstruct the deceased's view. The automobile was moving up grade in low gear at a speed of five to six miles per hour. Deceased could have stopped it almost immediately. It was his duty to approach the crossing at such speed that he could stop after reaching a point where he could see the approaching train and before coming within the danger zone." This opinion was written by Judge D. E. Blair, who. dissenting in a later case, State ex rel. Hines v. Bland, 237 S. W. (Mo.) 1018, 1021, said: "The question of contributory negligence cannot be determined by hard and fast rules. Each case must be determined on its own particular state of facts. . . . The real question is, what would an ordinarily prudent person have done under the same circumstances?" There is no question but that this is good law.

In Campbell v. St. Louis & Suburban Ry. Co., 175 Mo. 161, 172, 75 S. W. 86, this court said: "From the facts and circumstances shown by plaintiffs' evidence the conclusion might reasonably be drawn that the deceased was guilty of such negligence, but unless that is the only conclusion that can reasonably be drawn from those facts and circumstances, the demurrer to the evidence was properly overruled. If the evidence was such that there could reasonably be no two opinions about it, then its effect should have been declared by the court as a matter of law, otherwise, it was a question of fact for the jury. (Cases cited.)" [See, also, Jackson v. Railroad, 171 Mo. App. 430, 451, 156 S. W. 1005, affirmed by this court in 189 S. W. 381.]

If there were no other facts in the case than those just mentioned, it may be that defendant's contention as to plaintiff's contributory negligence should be sustained, though, when we consider the narrow margin in which the deceased had to operate after the train became visible, the question would be a close one, since a court is not justified in declaring a person guilty of contributory negligence unless the facts so showing are such that reasonable men could not come to a different conclusion.

There is, however, another important fact entering into this question, to-wit, the atmospheric conditions existing at the time of this accident.

W. H. Martin, who was riding at the side of the deceased, testified that as he and deceased approached the track after passing the obstructing building on the south, there was a storm coming up and it was dark and had commenced to rain. There was a lot of dust. Just commenced to rain, and the wind blowing, and lots of dust, and you couldn't see nothing much. The dust was coming up the track from both ways and was between the automobile and the coming train.

On cross-examinations, this witness said: "Q. Didn't you see the train? A. Couldn't see nothing through the dust. Q. You mean to tell the notary here that you couldn't even see that train, the dust was so bad you couldn't see the train when you heard it whistle? A. I never heard it whistle. It didn't whistle till it got right up to the crossing. . . . It was blowing from both directions and there was a lot of dust. Q. You were asked where the dust was and you said it was north of the train and south of Gibson Street? A. I said it was both ways. . . . I couldn't see the train or see behind it, but it was down on that side of the track and on both sides of the track. the dust was. Q. You told me you saw the train when it whistled? A. Well. you could see the train thirty or forty feet, no matter how much dust. . . . I saw the dust before we got up to the track both ways. Q. How far could you see the dust down the track then before you got up to it? A. Not but a little piece. You couldn't see down the track there for it. Q. Tell us in your own way when it was you saw the dust down the track south of the crossing; I want to know where you were when you saw it? A. Well, I was back a piece, I could see the dust, but I couldn't see down the track. couldn't see nothing down the track. I could see the dust down the track when I got up in front of the store. Q. And that is when you saw the train? A. Never saw it until after it whistled right at me. Q. It whistled the minute you came out from behind the store, you say? A. Yes, sir. Q. Well, did you see the dust before that? A. I didn't see the dust down the track. but I could see it in the air. It was down the track and had the air filled up until you couldn't see. Q. As far as you could see the air was filled up? A. Yes, sir. . . . Q. At the time it whistled he didn't have his brakes on? A. Yes, sir, I said he put them on a little tighter. Q. And then he did what besides putting the brakes on? A. He started to turn the car to the north. The dust was blowing till you couldn't see much. The train was about forty feet from the point of collision when it blew its whistle. . . . Q. Then the train, you say, was forty feet down the track when you first saw it? A. Yes, sir, something like that. He slowed down before we got up to the track, and he slowed down to about, he put on his brake and slowed down to about, I judge, twelve miles an hour, but when the whistle blew why he throwed on the brakes tighter. I couldn't tell you how slow he was going, but he was going very slow. Q. You say he threw on the brakes when the whistle blew? A. He had his brakes on, but he throwed them on tighter."

This witness at first said he heard the whistle and saw the train just after he passed the store building, but later when asked to mark on a photograph put in evidence where the automobile was when he first heard the sharp whistle and saw the train, he marked the

spot about half way between the obstructing store building and the track. To quote the witness: "Q. Now then, directing your attention to this exhibit, I wish you would please take a pen and make a mark on this picture at about the place where the automobile driven by Simpson, about where it was located when you heard the train whistle, and when you first saw the train. A. Right in about here. Q. Now then, you have made a cross mark with pen and ink on the street there at the place about where you were, have you? A. Yes. sir. Q. Where you were at the time you first saw the train and heard the whistle, is that correct? A. Yes, sir. . . . Then you think that from where the cross mark is up to the track is about thirty feet; that is your estimate of thirty feet in this picture? A. Fifteen feet from where the accident, and thirty feet from the store. Q. That it was—that you were thirty feet from that track when you first heard the whistle there? A. I said it was, just had come out from the store. and it was fifteen feet; thirty feet to the store; is what I testified. Q. You had just got out from behind the store when you heard the whistle; is that what you testified to? A. I just got out from the store. I suppose about half way to the track, I said, fifteen feet. Q. Thirty to thirty-five feet is what you said, wasn't it; thirty feet from the store to the crossing? A. Yes. Q. And the train whistled? A. I don't know just exactly how far we were out from the store, but probably fifteen feet of the track, because whenever the whistle—whenever it whistled, why the train hit us right then; so it couldn't have been far from the track."

W. J. Smith, a witness for plaintiff, testified that he was sitting in a car facing east and was on the west side of the track when the train passed him; that he did not hear either the bell or whistle till it looked like it was right at Gibson Street and it blew two short whistles just about the time of the crash. "I didn't hear any bell. . . . At the time this collision occurred there was a storm coming up from the west and it was very dusty and looked like a real hail storm coming up. The dust was awful severe. Q. Did you observe whether or not there were clouds of dust, or dust up around this crossing? A. Yes, sir, the plow west of the Gibson Street crossing, and the dirt had washed down in the street and the storm was coming right up on Gibson Street and it was very dusty. The dust was thick enough it would have been very difficult in driving facing this storm. It commenced raining just about the time they picked up those men. There was just a moment of time after the whistle occurred until I heard the crash."

J. W. Young testified: "It was stormy weather. There was a bad cloud coming up from the northwest—kind of began misting rain just about the time it happened. The wind was blowing awful hard. There was quite a bit of dust. I didn't hear the crossing bell at Gibson Street before this collision occurred. It was dark that morn-

ing. That cloud coming up and the wind blowing and dust too, it was pretty dark. The dust came right down the track almost from the northwest. I noticed lots of dust up around the Gibson Street crossing. The wind was from the northwest.''

F. M. Harris testified: "I did not hear the train whistle when it got up to Gibson Street. I did not hear it blow at all. It came up a terrible cloud—to the best of my knowledge I think it was out of the northwest, either out of the northwest or right out of the west. Us boys run into the shed. The dust began to blow and the wind, you couldn't hardly see nothing, you know. That is how come us in the shed.''

A. M. Cooley testified: "I saw this collision. I was looking east and was walking that way. I was trying to get over to those cabins out of the rain and the storm that was coming. I saw the automobile driven by Mr. Simpson just before it got to the crossing. It was storming and dusty—awful dusty that morning. There was dust everywhere—blowing everywhere around the crossing and everywhere. It was pretty thick at the time. I didn't know that there was a train coming until it was right there at me. This automobile wasn't traveling but about ten or twelve miles an hour. As Mr. Simpson drove up on the crossing, why the wind was blowing. Mr. Simpson came up on the track. I was standing over there and the train blew two short whistles. Mr. Simpson came right up there on the track and he turned north as the train hit him. It was done all in a second. The automobile was on the north side of the center of Gibson Street. He was turning north when he was struck—sideswiped. When I heard these two sharp whistles the train was right on the crossing nearly. I didn't hear any other whistles. I didn't hear any bell. If the crossing bell was ringing at that time, I never heard it. It was dark, stormy, big black cloud, dark at that time.''

The man riding with the deceased testified that he did not and could not see the coming engine till he heard the sharp warning signal, presumably given as soon as the engineer saw the automobile near the track, and the engineer testified that the engine was then entering onto the street and that he applied the engine brake about the middle of the street.

Under this evidence the court could not say as a matter of law that plaintiff was guilty of negligence in not seeing the silent oncoming train in time to have stopped before reaching the track. We take it that there was no headlight burning at the time and to what extent the visibility of this train was affected by the wind, dust and rain storm just breaking naturally had some effect on the occupants of this automobile, as it did on a number of the witnesses who were scurrying to shelter, and in considering contributory negligence this court has often taken into account the presence or absence of matters tending to distract or divert the attention of a person approaching

the railroad track. In Covell v. Wabash Ry. Co., 82 Mo. App. 180, the court said: "As already stated, it tends to prove that because of the darkness and smoky, foggy condition of the atmosphere, the plaintiff could not see and detect the moving of the cars at a distance sufficient to escape collision with a train running at the speed and without lights and other warning, as was this one. . . . . . It was not the province of this court to ignore these circumstances, conditions of the darkness, fog and smoke testified to, and arbitrarily declare that plaintiff could, if he had used his senses, have discovered the train coming down upon him in time to avert the injury." [Keim v. Union Railway & Transit Co., 90 Mo. 314, 321, 2 S. W. 427.]

The court submitted the question of the deceased's contributory negligence as barring plaintiff's recovery, notwithstanding any negligence of the defendant, on instructions drawn by and favorable enough to the defendant. Such was all that the defendant was entitled to under the facts of this case, and this is true whether we test the question by the law of Oklahoma or of Missouri.

In Gypsy Oil Co. v. Green (Okla.), 198 Pac. 851, the court said (syllabus): "Where, from the facts shown by the evidence, although undisputed, reasonable men might draw different conclusions regarding the question of negligence, such question is properly for the jury." In Littlejohn v. Midland Valley Railroad Co., 47 Okla. 204, 148 Pac. 120, the court said: "Questions of negligence do not become questions of law, to be decided by the court, except where the facts are such that all reasonable men must draw the same conclusions from them, and the case should not be withdrawn from the jury unless the conclusion follows, as a matter of law, that no recovery can be had upon any view which can properly be taken of the facts the evidence tends to establish." To the same effect is Chicago, R. I. & P. Ry. Co. v. Felder, 56 Okla. 220, 115 Pac. 529, and other cases might be cited.

In this connection it is claimed that the verdict for plaintiff is strongly against the weight of the evidence and that the trial court should have sustained defendant's motion for new trial and would have done so had not the court taken the erroneous view that the provision of the Constitution of Oklahoma, making the question of contributory negligence a question for the jury in all cases, had also the effect of making the verdict of the jury conclusive on the question of its being against the weight of the evidence. The record, however, does not show that the trial court even held the view that the Oklahoma law compelled a submission in a trial in this State of contributory negligence to the jury where the evidence establishes contributory negligence as a matter of law; and even if the court took that view it by no means follows that he also took the further view that he was thereby prevented from granting a new trial on the ground that the jury's finding was against the weight of the

evidence. We cannot convict the trial court of any such error, but must attribute his action to a holding that as the evidence made contributory negligence a question for the jury on the facts, the court would not disturb the verdict as being against the weight of the evidence. This is peculiarly the province of the trial court, and not of this court.

 The defendant criticises plaintiff's Instruction No. 3 which told the jury that if they find that at the time the deceased was struck and killed by defendant's train, the said train was being run at a greater rate of speed than twelve miles per hour within the City of Muskogee, and that the rate of speed at which it was being run "was excessive and dangerous under the circumstances and conditions existing at the time," resulting in deceased being struck and killed while in the exercise of ordinary care for his safety, then to find for the plaintiff. If we understand defendant's contention, it is that a violation of the speed ordinance was not pleaded as a basis of recovery and the jury was not required to find that such ordinance was in force at the time or was violated. A certified copy of the ordinance was put in evidence and its validity and being in force was not contested except on the ground that it was unreasonable and void as being discriminatory. This was a question of law for the court, and, being admitted in evidence, it was not necessary to submit and have the jury pass on the question of its being valid and in force. The jury had no right to find that the ordinance was not in force, and the instruction properly assumed that it was. While the jury was not in express terms required to find that defendant was violating the ordinance, it was required to find that defendant was running the train at a rate of speed exceeding twelve miles per hour. The running of the train within the City of Muskogee at a greater rate of speed than twelve miles per hour was necessarily a violation of the ordinance and was negligence *per se*. The only fact which plaintiff was required to prove, and the jury to find, in order to show defendant's negligence, was that the train was being run more than twelve miles per hour. [Karle v. Railroad, 55 Mo. 476, 483; Jackson v. Railroad, 157 Mo. 621, 643, 58 S. W. 32.] The plaintiff assumed an unnecessary burden in requiring the jury to find, in addition to the finding that the train was exceeding the ordinance rate of speed, that such rate was excessive and dangerous under the particular facts and circumstances. This instruction seems to have been borrowed from the Jackson case (157 Mo. l. c. 631) where the court said (l. c. 645) that it saw no objection to it. Defendant concedes that the speed ordinance was pleaded by plaintiff, but says it was not pleaded as a basis of recovery. The petition alleges that while deceased was approaching and attempting to cross the track at this crossing, he was struck and killed by defendant's train running "at a high and dangerous rate of speed of from thirty to thirty-five

miles per hour,'' and that at that time an ordinance of the city made it unlawful to operate a train over such crossing at a greater rate of speed than twelve miles per hour. The plaintiff's petition then enumerates categorically the acts of negligence which caused and to which deceased's death was solely due, and among them the running of the train at a speed which was too great and dangerous to persons using the streets. If it be true that a general charge of negligence, when coupled with a specific charge, should be limited to proof of the specific charge only, then it was necessary to prove, and for the jury to find, only the specific negligence of running the train more than twelve miles per hour, and the defendant cannot complain that the jury was required to further find that such rate of speed was too great and dangerous—a matter which the ordinance itself conclusively settled.

Instruction No. 4 is criticised as making the defendant an insurer of the safety of persons using the street and crossing. We do not think the jury would so understand it. It tells the jury that the defendant had a right to lay its tracks across the street and run its trains thereon, but that the right to so use the street was not exclusive in defendant, but it was required to so run its trains over the crossing ''in such manner as to not injure others who were themselves lawfully using said street and street crossing;'' and that the running of trains at a high rate of speed over such crossing without giving a reasonable warning of the approach of same by ringing a bell or sounding a whistle would subject defendant to liability to plaintiff, if the jury so found, unless the deceased was himself guilty of negligence. This instruction, we think, when read as a whole, fairly presents this phase of the case and that is all it purports to do.

The instructions are criticised as not correctly stating the measure of damages. The first instruction for plaintiff covering the whole case and authorizing a finding for plaintiff closes by saying: ''Then and in that event your verdict should be for plaintiff in such sum as you may find from the evidence she is justly entitled to, not exceeding, however, the sum of $75,000, the amount prayed for.'' A separate instruction on the measure of damages was then given as follows:

''The court instructs the jury that if you find for the plaintiff, in estimating the damages you should take into consideration the age of plaintiff's deceased, G. T. Simpson, at the time of his death, his power to earn money and the amount of money he contributed to his family, together with his probable expectancy in life and his power to earn money in the future, and allow the plaintiff and her minor children such a sum as you may find and believe from the evidence she is justly entitled to, not exceeding, however, the sum of $75,000, the amount prayed for in the petition.''

The criticism is that the damage is not limited to the pecuniary

loss sustained by plaintiff and her children, but would allow the jury to give damages for mental and physical suffering, loss of society, fatherly advice, etc. The Oklahoma statute provides that the action for wrongful death may be maintained by the personal representative of the deceased and "the damages must inure to the exclusive benefit of the surviving spouse and children, if any." Here the surviving spouse was the wife and there were five children ranging in age from one to ten years, for whose benefit this action is maintained. The verdict is for $10,000. It is true that the damages to be awarded must be limited to the pecuniary loss, such as will compensate for the money loss sustained, and that "the law does not undertake to heal the wounds of grief nor to supply the counsel and comforts of a husband and father." [New v. McMillan, 79 Okla. 70, 191 Pac. 160, 166.] It is held, however, that in a case of this kind the jury may consider not only the amount of the earnings of the husband and father which would probably have inured to the support of the wife and children, but also "the pecuniary value of his personal services in the care, maintenance and rearing of the family." The court properly told the jury that in determining the amount of damages to take into consideration the age and expectancy of the deceased without any mention of the age or expectancy of the widow. [Missouri, O. & G. Ry. Co. v. Lee (Okla.), 175 Pac. 367, 370; Emery v. City of Philadelphia, 208 Pa. 492, 57 Atl. 977.] In the very nature of things there can be no fixed standard for measuring the damages to a widow and her flock of children arising from the death of the husband and father. Such must largely be left to the common experience and sound judgment of a dispassionate jury. An instruction on the measure of damages must consist largely of inclusions and exclusions of the proper and improper elements to be considered by the jury. The plaintiff's instruction properly told the jury to include the age and expectancy in life of the deceased, his earning capacity, both present and future, the amount contributed to the support of the wife and children, and other elements such as the health, habits of industry, etc., might have been added. On the other hand, if the defendant had reason to believe that the jury might include improper elements of damage, such as the physical suffering of the deceased or the mental anguish of the widow and children, or the loss of the society or companionship of the husband and father, it was certainly proper, if not its duty, for defendant to ask an instruction excluding the objectionable elements from the jury's consideration. In the present case the defendant asked and was given instructions presenting the defendant's side of every issue, such as the alleged negligence in failing to give warning of the train's approach to the crossing, the negligent rate of speed, and the deceased's contributory negligence in going on the track ahead of the train, but defendant asked nothing on the measure of damages.

It cannot be said that the instructions given for plaintiff resulted in excessive damages being given. The deceased was thirty-three years of age and had an expectancy of about the same, was earning about $300 per month and contributed about $200 per month to the support of the family. The amount of the verdict is moderate and within legitimate limits and there is no reason to believe that the jury allowed improper damages.

Other criticisms of the instructions given are made by the appellant, but, while we have examined the same, we think it would serve no useful purpose to prolong this decision in a discussion thereof.

The case appears to have been fairly tried and no reversible error is found. The judgment, therefore, will be affirmed. *Ferguson* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by STURGIS, C., is adopted as the opinion of the court. All the judges concur, except *Hays, J.,* absent.